HAWAII PSYCHIATRIC SOCIETY, DISTRICT BRANCH OF the AMERICAN PSYCHIATRIC ASSOCIATION, a Hawaii Nonprofit Corporation, et al., Plaintiffs,

v.

George R. ARIYOSHI, in his official capacity as Governor of the State of Hawaii, et al., Defendants.

No. CV 79–0113.

United States District Court, D. Hawaii.

Oct. 22, 1979.

Mark S. Davis, Stanley E. Levin, Honolulu, Hawaii, for plaintiffs.

Wayne Minami, Atty. Gen., Michael A. Lilly, Deputy Atty. Gen., Honolulu, Hawaii, for defendants.

## ORDER

WM. MATTHEW BYRNE, Jr., District Judge.

Section 8 of Act 105 of the 1978 Session Laws of the State of Hawaii ["Section 8"] authorizes the issuance of administrative inspection warrants, upon a sworn affidavit showing "probable cause," to search the offices and records of Medicaid "providers." A "provider" is a person or institution authorized to provide health care, suppliers or services to beneficiaries of medical assistance.[1] "Probable cause" is defined for purposes of Section 8 as showing of a valid public interest in the effective enforcement of Act 105, sufficient to justify administrative inspection in the circumstances specified in the application for the warrant.[2] The complaint alleges that Section 8 and defendants' application of it violate plaintiffs' right to be free from unreasonable searches and seizures guaranteed by the Fourth Amendment, and their and their patients' right to privacy guaranteed by the Ninth Amendment. The matter is before

---

1. Section 1, Act 105, 1978 Session Laws of the State of Hawaii, Act 105 was enacted as S.B. No. 2609–78, amending Chapter 346 of the Hawaii Revised Statutes. The act will hereafter be referred to as "Act 105."

2. Section 8, Act 105.

the Court on defendants' motion for summary judgment and plaintiffs' application for a preliminary injunction.

## BACKGROUND

Act 105 of the 1978 Session Laws was enacted in conjunction with Act 106, which establishes a Medicaid Fraud Unit under the Department of the Attorney General for the investigation and prosecution of Medicaid fraud. Section 6 of Act 105 requires that each provider maintain for a period of three years "such records as are necessary to disclose fully the type and extent of health care, service or supplies provided to medicaid recipients." Section 6 further requires that providers make such records available upon request to authorized representatives of the Attorney General's office or the Department of Social Services and Housing, and makes wilful refusal to make records available a misdemeanor. Section 8 authorizes the issuance of warrants to inspect, copy and maintain records required to be kept under Section 6.[3] Act 105 also requires confidentiality of provid-

---

3. Section 8 provides:

SECTION 8. Chapter 346, Hawaii Revised Statutes, is amended by adding a new section to be appropriately designated and to read:

"Sec. 346. Administrative inspections and warrants. (a) Issuance and execution of administrative inspection warrants shall be as follows:

(1) A judge of the circuit court, or any district judge within his jurisdiction, and upon proper oath or affirmation showing probable cause, may issue warrants for the purpose of conducting administrative inspections authorized by this chapter or rules hereunder, and seizures of the property appropriate to the inspections. For purposes of the issuance of administrative inspection warrants, probable cause exists upon showing a valid public interest in the effective enforcement of this chapter or rules hereunder, sufficient to justify administrative inspection of the area, premises, building, conveyance or records in the circumstances specified in the application for the warrant;

(2) A warrant shall issue only upon an affidavit of an individual having knowledge of the facts alleged, sworn to before the judge and establishing the grounds for issuing the warrant. If the judge is satisfied that grounds for the issuance exist or that there is probable cause to believe they exist, he shall issue a warrant identifying the area, premises, building, conveyance or records to be inspected, the purpose of the inspection, and, if appropriate, the type of property to be inspected, if any. The warrant shall:

(A) State the grounds for its issuance and the name of each person whose affidavit has been taken in support thereof;

(B) Be directed to a person authorized by the attorney general or the director of social services and housing to execute it;

(C) Command the person to whom it is directed to inspect the area, premises, building, conveyance or records identified for the purpose specified and, if appropriate, use reasonable force in conducting the inspection authorized by the warrant and direct the seizure of the property specified;

(D) Identify the item or types of property to be seized, if any;

(E) Direct that it be served during normal business hours and designate the judge to whom it shall be returned;

(3) A warrant issued pursuant to this section must be executed and returned within ten days of its date unless, upon a showing of a need for additional time, the court orders otherwise. If property is seized pursuant to a warrant, a copy shall be given to the person from whom or from whose premises the property is taken, together with a receipt for the property taken. The return of the warrant shall be made promptly, accompanied by a written inventory of any property taken. The inventory shall be made in the presence of the person executing the warrant and of the person from whose possession or premises the property was taken, if present, or in the presence of at least one credible person other than the person executing the warrant. A copy of the inventory shall be delivered to the person from whom or from whose premises the property was taken and to the applicant for the warrant;

(4) The judge who has issued a warrant shall attach thereto a copy of the return and all papers returnable in connection therewith and file them with the clerk of the issuing court.

(b) The designated representative of the attorney general or the department may make administrative inspections of provider premises in accordance with the following provisions:

(1) For purposes of this section only, "provider premises" means;

(A) Places where providers are required to keep records; and

(B) Places where providers conduct business related to their receipt of payments from the medicaid program for health care, service or supplies.

(2) When authorized by an administrative inspection warrant issued pursuant to subsection (a) the representative upon presenting the warrant and appropriate credentials to the owner, operator, or agent in charge, may

ers' records obtained or maintained by the State and provides penalties for violation of the Act's requirements.

On December 18, 1978, an administrative inspection warrant was issued authorizing the search and seizure of plaintiff Virgil Willis, Jr.'s records relating to Medicaid beneficiaries, including therapeutic notes, patient history forms, medical records and reports, and diagnoses. The affidavit in support of the warrant stated that Willis was a licensed clinical psychologist and a Medicaid provider, that his offices had never been inspected pursuant to Section 8, and that such inspection was in the public interest.[4] No showing was made as to any par-

enter providers premises for the purpose of conducting an administrative inspection.

(3) When authorized by an administrative inspection warrant, the representative may:

(A) *Inspect and copy records* required by this chapter to be kept;

(B) Retain records required by this chapter to be kept for a reasonable period of time, not to exceed forty-eight hours, for the pur*pose of examination, audit, copying, testing* or photographing;

(C) Inspect, examine and test diagnostic devices used in the provision of health care, service or supplies to a medicaid recipient;

(D) Inventory any stock of any substance used in the provision of health care, service or supplies to a medicaid recipient and to obtain samples thereof;

(E) *Inspect, examine and test, within reasonable limits and in a reasonable manner, provider premises and equipment as necessary to assure compliance with this chapter*

(4) This section does not prevent the inspection without a warrant of property, books and records pursuant to an administrative subpoena issued in accordance with law, nor does it prevent entries and administrative inspections, including seizures of property, without a warrant:

(A) *If the owner, operator, or agent in charge of the provider premises consents* ;

(B) In situations presenting imminent danger to health or safety;

(C) In situations involving inspection of conveyances if there is reasonable cause to believe that the mobility of the conveyance makes it impracticable to obtain a warrant;

(D) In all other situations in which a warrant is not constitutionally required."

4. The affidavit states:

STANLEY Y. UEHARA, an Investigator for the Attorney General, State of Hawaii, hereby applies for an Administrative Inspection Warrant pursuant to Section 8, Act 105, 1978 Session Laws of Hawaii, for the inspection of the provider's premises, a single family dwelling, located at 28 Palione Place, Kailua, Hawaii, in a residential district, and the following records and property: billings or accounts receivable records; records of patient appointments; treatment authorization requests; patient history forms, medical records, reports, diagnoses and orders prescribing treatment plans; records of requests for and results of tests and examinations ordered or furnished to recipients; records of prescriptions, medications, drugs, assistive devices, or appliances prescribed, ordered for or furnished to recipients, including acquisition records; records which show the date, time, and length of office visits, tests or treatments performed by or at the request of the provider; bookkeeping, accounting, tax, payroll, and other records and documents identifying persons paid by the provider for services performed for Medicaid beneficiaries, together with other instrumentalities and evidence relating to Medicaid claims made by the provider at this time unknown.

And being first duly sworn on oath, deposes and says:

1. That records, diagnostic devices and supplies used for the provision of health care and service are required to be made available at this location. That based upon Affiant's experience, a provider's records are kept at his place of business and Affiant believes these records are at this location. That VIRGIL WILLIS, JR., maintains two offices and the records will be at one or both places of business.

A. That this establishment has never been inspected by the Investigator for the Attorney General, State of Hawaii, since the enactment of the maintenance and availability of records provision, Section 6, Act 105, 1978 Session Laws of Hawaii.

B. That the records of the Department of Social Services and Housing show that VIRGIL WILLIS, Jr., is a psychologist authorized by the Department of Social Services and Housing to provide health care, service or supplies to beneficiaries of medical assistance (Medicaid). That in an application to participate in the Medicaid Program dated November 7, 1975, VIRGIL WILLIS, Jr., agreed:

". . . to keep such records as are necessary to disclose fully the extent of care and/or services provided to eligible persons and to furnish the Department of Social Services and Housing such information regarding any payments that have been claimed under the program as the Department may require."

This application was renewed on January 3, 1978.

C. That the records of the Department of Social Services and Housing show that VIRGIL WILLIS, Jr, is being paid by the Medicaid Pro-

ticularized need to inspect Willis's records. Further, Willis was never requested, pursuant to Section 6, to produce voluntarily the information described in the warrant. On December 28, 1978, the warrant was exe‍cuted at Willis's office, records were seized, and copies made of those records, which copies are still in the possession of the Attorney General.

On March 7, 1979, Willis and plaintiff Hawaii Psychiatric Society filed this action challenging the constitutionality of Section 8, both on its face and as applied to Willis. The Hawaii Psychiatric Society, a district branch of the American Psychiatric Association, is a nonprofit corporation composed of 115 psychiatrists, a majority of whom are Medicaid providers. Defendants are all officials of the State of Hawaii authorized to implement Section 8, and are sued in their official capacity.

This case raises issues concerning the right of privacy inherent in the psychotherapist-patient relationship and the reasonableness of administrative searches of psychiatrists' offices. Neither area has been addressed directly by the Supreme Court, and only a few lower courts have discussed the issues. For the reasons set forth below, defendants' motion for summary judgment is denied, and plaintiffs' application for a preliminary injunction is granted.

## MOTION FOR SUMMARY JUDGMENT

■ Defendants urge this court to abstain from deciding the constitutional ques-

tions presented by this case. They contend that the court may not enjoin "ongoing state criminal proceedings." At the time the complaint was filed and at the time of the hearing on these motions, no ongoing criminal or civil proceeding was pending involving the parties to this action or Section 8. The Supreme Court has stated:

" 'When no state criminal proceeding is pending at the time the federal complaint is filed, federal intervention does not result in duplicative legal proceedings or disruption of the state criminal justice system; nor can federal intervention, in that circumstance, be interpreted as reflecting negatively upon the state courts' ability to enforce constitutional principles.' "

*Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 1217, 39 L.Ed.2d 505 (1974), *quoted in Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 1207–08, 43 L.Ed.2d 482 (1975). *Accord, Ellis v. Dyson,* 421 U.S. 426, 95 S.Ct. 1691, 1695, 44 L.Ed.2d 274 (1975). There is accordingly no basis for this court to abstain from enjoining any state proceeding.

■ Defendants also urge abstention in order to give the state courts an opportunity to construe Section 8 before this court rules on its constitutionality. Abstention is appropriate in cases presenting a constitutional issue "which might be mooted or presented in a different posture by a state court determination of pertinent state law." *Colorado River Water Conser. Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); *Lake Carrier's As-*

gram for claims submitted for services rendered to Medicaid beneficiaries.

D. That it is in the public interest to determine whether or not the aforementioned records are being kept and to determine the type and extent of health care, service or supplies that is being provided to Medicaid recipients, and to validate claims for payment that have been made against the Medicaid Program.

2. That this is an inspection undertaken under the statutorily authorized inspection program designed to assure the validity of claims made by the provider and in compliance with the maintenance and availability of records section of Act 105, 1978 Session Laws of Hawaii.

3. That the inspection will be conducted within business hours. The Investigator's credentials will be presented to the provider or

agent in charge as prescribed in Section 8, Act 105, 1978 Session Laws of Hawaii.

4. That the Investigator for the Attorney General, State of Hawaii, may be accompanied by one or more duly authorized agents of the Department of Social Services and Housing and other State officials to assist in the inspection.

5. That the authority for the issuance of the Administrative Inspection Warrant is Section 8, Act 105, 1978 Session Laws of Hawaii. That based upon the facts set out herein, probable cause exists for issuance of a warrant directing the inspection of said provider's premises and records.

Further Affiant sayeth not.

/s/ Stanley Y. Uehara
Stanley Y. Uehara

*soc. v. MacMullan,* 406 U.S. 498, 92 S.Ct. 1749, 1757, 32 L.Ed.2d 257 (1972). But even where a state statute has never been interpreted by a state court, if the statute is not susceptible to an interpretation that would avoid or modify the federal constitutional question, the federal court must decide the question. *Zwickler v. Koota,* 389 U.S. 241, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967). This is especially true where a state statute has been challenged on its face and forcing the plaintiff to suffer the delay of state court proceedings might itself effect a chilling of the very constitutional rights he seeks to protect. *Id.,* 389 U.S. 241, 88 S.Ct. at 397–98.

■ These principles preclude this court from abstaining from decision of the constitutional questions presented here. Section 8 is not susceptible of any interpretation that would significantly modify the substance or effect of the constitutional analysis set forth below.[5] Further, the Attorney General of the State of Hawaii has urged no narrowing interpretation and contends, and stated at oral argument that he would contend in the state courts, that the statute is constitutional on its face and as applied to Willis. *Compare Carey v. Sugar,* 425 U.S. 73, 96 S.Ct. 1208, 1210–11, 47 L.Ed.2d 587 (1976) (state officials urged narrowing construction of challenged statute).

■ Defendants contended in their moving papers that this action is barred by the Eleventh Amendment. The Supreme Court made clear in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), that actions for injunctive and declaratory relief against state officials acting in their official capacity are not barred by the Eleventh Amendment. Defendants conceded as much at the hearing on these motions.

The only remaining issue raised by defendants' motion for summary judgment is the constitutionality of Section 8. For reasons set forth with regard to plaintiffs' application for a preliminary injunction, defendants are not entitled to summary judgment on the ground that Section 8 is constitutional.

## APPLICATION FOR PRELIMINARY INJUNCTION

■ A preliminary injunction should issue upon a clear showing by the plaintiff of either (1) probable success on the merits and possible irreparable harm, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Benda v. Grand Lodge of Intern. Ass'n,* 584 F.2d 308, 315 (9th Cir. 1978); *Aguirre v. Chula Vista Sanitary Service,* 542 F.2d 779, 781 (9th Cir. 1976); *Kupau v. Yamamoto,* 455 F.Supp. 1084, 1087–88 (D.Haw.1978). Where the balance of harm tips decidedly toward the plaintiff, he need not show as substantial a likelihood of success on the merits. Conversely, where the probability of success on the merits is high, plaintiff need only show a possibility of irreparable harm. *See Benda v. Grand Lodge of Intern. Ass'n, supra,* 584 F.2d at 315. Plaintiffs here have established a very high probability of success on the merits and a substantial possibility of irreparable harm.

---

5. The only narrowing interpretation to which Section 8 would conceivably be susceptible would be that it requires a showing, *based on specific facts satisfying neutral criteria,* that inspection of a particular provider's records is in the public interest. *See* pages 1050·1052 *infra.* On its face, however, Section 8 authorizes issuance of warrants on the basis of a general showing that an inspection is in the public interest. No objective standards are set forth to determine when that is the case, and no such standards are required to be adopted or used by the administering agency. The At-

torney General has not urged that Section 8 be interpreted to require adoption or use of any more ⸌specific standards. Further, the court concludes below that the section would be unconstitutional even were it so interpreted. *See* pages 1045–1046 *infra.* To abstain from deciding this case would merely delay decision of an important federal constitutional issue so that a state court may determine a relatively clear and ultimately indeterminative issue of state law. Such abstention would be inappropriate.

### 1. *The Merits—The Right to Privacy*

█ Before the court turns to the merits of plaintiffs' right to privacy claim, the question of plaintiffs' standing demands attention. Plaintiffs challenge Section 8 on the ground that it violates their right to privacy guaranteed by the Ninth Amendment. The court reads the complaint and plaintiffs' application for a preliminary injunction as raising also the privacy rights of their present and future patients who are Medicaid beneficiaries. The court concludes that plaintiffs have standing to raise both their own privacy rights and those of their patients. *See Carey v. Population Services Intern.,* 431 U.S. 678, 97 S.Ct. 2010, 2015–16, 52 L.Ed.2d 675 (1977).

█ Section 8 inflicts on the plaintiffs "injury in fact" that satisfies Article III's case or controversy requirement, since the warrants issued pursuant to the statute would authorize search and seizure of the psychiatrists' records. *Carey v. Population Services Intern., supra,* 97 S.Ct. at 2015–16; *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 455, 50 L.Ed.2d 397 (1976). Here, as in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 1679, 14 L.Ed.2d 510 (1965), the psychiatrists have a professional relationship with the patients whose constitutional rights they attempt to raise. Most importantly, enforcement of Section 8 will materially affect the rights of Medicaid beneficiaries who may have no effective way of asserting those rights in a manner that would prevent their violation.[6] *See Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 1034, 31 L.Ed.2d 349 (1972). It is the psychiatrists who have the opportunity as well as the incentive to assert the privacy rights of their patients by challenging the administrative warrant provisions of Section 8, and the court holds that they have standing to do so.

█ Although "[t]he Constitution does not explicitly mention any right of privacy," the Supreme Court has recognized that one aspect of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment is "a right of personal privacy, or a guarantee of certain areas or zones of privacy." *Carey v. Population Services Intern., supra,* 431 U.S. 678, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675; *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 706, 35 L.Ed.2d 147 (1973).[7] The content of the constitutional right of privacy remains largely undefined, but the Court has identified at least two strands of the web of privacy.

> "The cases sometimes characterized as protecting 'privacy' have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions."

*Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 876 & n. 24, 51 L.Ed.2d 64 (1977). The administrative inspection scheme at issue here implicates both strands of analysis. The court will first consider the interest in independent decision-making, sometimes called an interest in autonomy, and then consider the interest in avoiding disclosure,

---

6. The patients might not even become aware of the existence of Section 8 or a warrant regarding records pertaining to them until long after personal information had been disclosed.

7. Plaintiffs raise the right to privacy as guaranteed by the Ninth Amendment. Some justices have seen privacy as protected by that amendment. *See Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring, joined by Warren, C. J., and Brennan, J.). In *Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973), however, the Court expressed the opinion that the right of privacy is founded in the Fourteenth Amendment's concept of personal liberty.

"This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state actions, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." 93 S.Ct. at 727.

This appears to be a distinction without a difference. *See Plante v. Gonzalez,* 575 F.2d 1119, 1127 n. 12 (5th Cir. 1978). Whether it be grounded in the Ninth or Fourteenth Amendment, plaintiffs have a right to privacy.

or confidentiality. *See Plante v. Gonzalez,* 575 F.2d 1119, 1128 (5th Cir. 1978).

### A.

The Supreme Court has recognized an individual's right to make decisions free from unjustified governmental interference on matters relating to marriage, *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); procreation, *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 1113–14, 86 L.Ed. 1655 (1942); contraception, *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 1038–39, 31 L.Ed.2d 349 (1972); *Carey v. Population Services Intern., supra,* 97 S.Ct. at 2016; family relationships, *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); child rearing and education, *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); and abortion, *Roe v. Wade, supra,* 93 S.Ct. at 727. In *Whalen v. Roe, supra,* the Court implicitly expressed the opinion that decisions regarding medical care also fall within this protected zone of autonomy. 97 S.Ct. at 876–79; *see Plante v. Gonzalez, supra,* 575 F.2d at 1131.

■ An individual's decisions whether or not to seek the aid of a psychiatrist, and whether or not to communicate certain personal information to that psychiatrist, fall squarely within the bounds of this "cluster of constitutionally protected choices," *Carey v. Population Services Intern., supra,* 97 S.Ct. at 2016. The Supreme Court has consistently been concerned with protecting individuals against governmental intrusion into matters affecting the most fundamental personal decisions and relationships. *See id.,* at 2017. No area could be more deserving of protection than communications between a psychiatrist and his patient. Such communications often involve problems in precisely the areas previously recognized by the Court as within the zone of protected privacy, including family, marriage, parenthood, human sexuality, and physical problems.

■ Constitutionally protected privacy must, at a minimum, include the freedom of an individual to choose the circumstances under which, and to whom certain of his thoughts and feelings will be disclosed. *See Lora v. Board of Education,* 74 F.R.D. 565, 570 (E.D.N.Y.1977), *citing* Ruebhausen & Brim, "Privacy and Behavioral Research," 65 *Colum.L.Rev.* 1184 (1965). This right to choose confidentiality is particularly crucial in the context of communications between patient and psychotherapist. As Judge Hufstedler has written:

"Psychotherapy probes the core of the patient's personality. The patient's most intimate thoughts and emotions are exposed during the course of the treatment. ' "The psychiatric patient confides [in his therapist] more utterly than anyone else in the world. . . . [H]e lays bare his entire self, his dreams, his fantasies, his sin, and his shame." ' (*Taylor v. United States* (1955) 95 U.S.App.D.C. 373, 222 F.2d 398, 401, quoting Guttmacher and Weinhofen, *Psychiatry and the Law* 272 (1952).). The patient's innermost thoughts may be so frightening, embarrassing, shameful or morbid that the patient in therapy will struggle to remain sick, rather than to reveal those thoughts even to himself. The possibility that the psychotherapist could be compelled to reveal those communications to anyone . . . can deter persons from seeking needed treatment and destroy treatment in progress. [*citing* J. Katz, J. Goldstein, & A. Dershowitz, *Psychotherapy, Psychoanalysis and the Law* 726–27 (1967).]" *Caesar v. Mountanos,* 542 F.2d 1064, 1071–72 (9th Cir. 1976) (Hufstedler, J., dissenting). Many courts and commentators have concluded that, because of the uniquely personal nature of mental and emotional therapy, accurate diagnosis and effective treatment require a patient's total willingness to reveal the most intimate personal matters, a willingness that can exist only under conditions of the strictest confidentiality. *See* Statement of the American Psychiatric Ass'n before the Subcommittee on Government Information and Individual Rights, April 9, 1979; Slovenko, "Psychiatry and a

Second Look at the Medical Privilege," 6 *Wayne L.Rev.* 175 (1960); Guttmacher and Weinhofer, *Psychiatry and the Law, supra; Caesar v. Mountanos, supra,* 542 F.2d at 1067; *Lora v. Board of Education, supra,* 74 F.R.D. at 571.

 The court holds that the constitutionally protected right of privacy extends to an individual's liberty to make decisions regarding psychiatric care without unjustified governmental interference. *See Caesar v. Mountanos, supra,* 542 F.2d at 1067 n. 9 ("right of privacy . . . extends to psychotherapist-patient communications").

 That the right of privacy extends to decisions regarding psychiatric care does not, however, automatically render Section 8 of Act 105 invalid. Psychiatric care may be regulated in ways that do not infringe protected individual choices, and even a burdensome regulation may be validated by a sufficiently compelling state interest. *See Carey v. Population Services Intern., supra,* 97 S.Ct. at 2016. But, as the Supreme Court has written in the context of abortions:

> " 'Compelling' is of course the key word; where a decision as fundamental as that whether to bear or beget a child is involved, regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests."

*Roe v. Wade, supra,* 93 S.Ct. at 727–28. This court's inquiry, therefore, must be whether Section 8 burdens the individual's liberty to make decisions regarding psychiatric care, and, if so, whether the State has demonstrated that the statute represents the least restrictive means to achieve a compelling state interest.

Plaintiffs urge that the threat of disclosure and actual disclosure of personal information revealed to a psychotherapist in the course of treatment adversely affects the freedom of an individual to choose and to receive adequate psychiatric care. They contend that searching, copying and maintaining confidential records of psychiatrists pursuant to Section 8 will inhibit candid communications between the patient and

his psychiatrist. Plaintiffs further contend that analysis and treatment will itself be inhibited by the psychiatrist's fear that his notes and diagnoses may be reviewed by state officials, revealing to those officials highly personal and sensitive concerns of his patients. The court agrees.

 In order to trigger the compelling state interest standard, the burden on an individual's freedom to make a protected choice need not entirely foreclose the choice. In a series of decisions after *Roe v. Wade, supra,* the Court held unconstitutional statutes that did not prohibit abortions outright but limited in a variety of ways a woman's access to them, *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Planned Parenthood of Central Mo. v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), and statutes that did not prohibit but placed restrictions on distribution of contraceptives, *Carey v. Population Services Intern., supra; Eisenstadt v. Baird, supra.*

> "The significance of these cases is that they establish that the same test must be applied to state regulations that burden an individual's right to decide . . . by substantially limiting access to the means of effectuating that decision as is applied to state statutes that prohibit the decision entirely."

*Carey v. Population Services Intern., supra,* 97 S.Ct. at 2018.

The evidence presented by plaintiffs in support of the claim that Section 8 will inhibit individuals from seeking psychiatric care and communicating with their psychiatrists is uncontradicted by defendants. The few courts that have addressed the issue have assumed that disclosure of communications between an identifiable patient and his psychiatrist would deter individuals from seeking care and impair the therapy process itself. *Caesar v. Mountanos, supra,* 542 F.2d at 1067; *Lora v. Board of Education, supra,* 74 F.R.D. at 570–71.

In *Caesar,* petitioner, a psychiatrist, sought a writ of habeas corpus to set aside a contempt adjudication for refusal to obey

an order directing him to answer questions relating to communications with a former patient. 542 F.2d at 1065. California Evidence Code § 1016 provided that no psychotherapist-patient privilege existed as to communications relevant to an issue raised by the patient concerning his mental or emotional condition. *Id.; see also In re Lifschutz,* 2 Cal.3d 415, 85 Cal.Rptr. 829, 467 P.2d 557 (1970). The Court of Appeal concluded that, where the right of privacy had been impliedly waived by the patient, the state's "compelling need" to ascertain the truth in court proceedings justified the intrusion into the psychotherapist-patient relationship. 542 F.2d at 1071.

In *Lora,* plaintiffs had brought a civil rights action challenging standards used by the Board of Education in New York to identify and place emotionally handicapped children. 74 F.R.D. at 568. They sought discovery of diagnostic and evaluation files regarding fifty randomly selected and unidentifiable children. The court, in concluding that any adverse impact on the children's rights would be minimal, relied heavily on the facts that the anonymity of the children was assured, that the information was sought in the context of a judicial proceeding, and that the court would both determine the existence of a compelling social need for disclosure and supervise the maintenance of confidentiality. *Id.* at 573–74, 583. Here, by contrast, the information sought would necessarily identify the patient and would be disclosed pursuant to the issuance of a warrant based on a general standard of "the public interest."

█ The Supreme Court has suggested that the degree of threat of public disclosure is a factor to consider in determining the constitutionality of an intrusion into a protected decisionmaking area. *See Whal-*

*en v. Roe, supra.* Here, Section 2 of Act 105 contains relatively strict requirements for the confidentiality of records maintained by the State pursuant to the Act, and the threat of public disclosure of those records may be small. However, the court does not believe that Act 105's confidentiality requirements are sufficient to prevent the administrative inspection procedures from unconstitutionally intruding into a patient's freedom to decide.

In *Whalen,* the Court addressed the question whether portions of the New York State Controlled Substances Act of 1972, requiring the recording in a centralized computer file of the names and addresses of all persons who had obtained, pursuant to a doctor's prescription, "Schedule II" drugs, violated the plaintiffs' right of privacy. 97 S.Ct. at 872. The plaintiffs urged that the mere existence of the information in readily available form created a concern that the information would become publicly known and made some patients reluctant to use, and some doctors reluctant to prescribe, Schedule II drugs. *Id.* at 877.

The constitutional challenge in *Whalen* focused not on the disclosure of the patients' names and addresses to the State, but on the threat of public disclosure of that information that was inherent in the computer filing system. New York had long required doctors to disclose to the State the names and addresses of persons receiving prescriptions for Schedule II drugs, and that requirement was not challenged in *Whalen.* 97 S.Ct. at 880 (Brennan, J., concurring). The Court upheld the statute, relying on the State's "*vital interest* in controlling the distribution of dangerous drugs" and the insufficiency of any showing of an increased threat of public disclosure of the stored information. *Id.* at 875–76, 877–78.[8]

8. The Court wrote:
"Public disclosure of patient information can come about in three ways. Health Department employees may violate the statute by failing, either deliberately or negligently, to maintain proper security. A patient or a doctor may be accused of a violation and the stored data may be offered in evidence in a judicial proceeding. Or, thirdly, a doctor, a

pharmacist or the patient may voluntarily reveal information on a prescription form.
"The third possibility existed under the prior law and is entirely unrelated to the existence of the computerized data bank. Neither of the other two possibilities provides a proper ground for attacking the statute as invalid on its face. There is no support in the record, or in the experience of the two States

■ Here, the constitutional challenge is of a different nature. Plaintiffs contend that compelled disclosure to and maintenance by the State of personal information revealed by a patient to his psychiatrist is itself an impermissible intrusion into the individual's right of privacy, irrespective of whether the information is disclosed to the public. The private information disclosed to the State in *Whalen* consisted of the patient's name, age, address, and use of a certain drug. Here, the degree and character of the disclosure is far more intrusive. The psychiatrist's records may include the patient's most intimate thoughts and emotions, as well as descriptions of conduct that may be embarrassing or illegal. The possibility that those records could be disclosed to anyone, whether it be state officials or the public, is sufficient to constitute an intrusion into the right of privacy warranting scrutiny under the compelling state interest standard. *See McKenna v. Fargo*, 451 F.Supp. 1355, 1380–81 (D.N.J.1978), *supra* pages 1037–1038.

The State urges that the purpose of the administrative warrant procedure is to ensure access to the records required to be kept by Section 6 of Act 105. The records are required to be kept

"[t]o enable another provider to determine the proper course of treatment in emergencies and in order to determine whether a provider is genuinely entitled to reimbursement and to protect the medicaid program against fraud and abuse . . . ."

Section 6(a), Act 105, 1978 Session Laws of State of Hawaii. The Attorney General has described the rationale behind Section 6:

"To protect [the State] from false or fraudulent claims, the State must be able to verify through the provider's records that the service or treatment for which it is being billed was actually rendered, that the drugs, medications, appliances and assistive devices for which the program is

paying were actually ordered and dispensed, that the amount the program is being charged is reasonably related to the provider cost and that where fraud is suspected, tools necessary to prove it are accessible to the State."

Testimony of the Attorney General on S.B.N. 2609. The administrative inspection warrant procedure in Section 8 was enacted to authorize the use of reasonable force to inspect a provider's records where the provider refuses to permit such inspection voluntarily. *See id.*

■ The State has a compelling interest in ensuring that services and supplies for which it is being billed have been provided, and that the medicaid program is not being defrauded. But Section 8 is not narrowly drafted to express only those State interests. There has been no showing, and the court does not believe that there could be a showing, that the issuance of warrants to search and seize the therapeutic notes, patient history forms, diagnoses, and other confidential medical records of a psychiatrist, absent even a suspicion that an individual provider has defrauded the State or failed to maintain records, is necessary to serve any of the State interests put forward.

The statute requires a provider to make available upon request records "necessary to disclose fully the type and extent of health care services or supplies provided to medicaid recipients," and makes failure to do so a misdemeanor. Section 6, Act 105. There is no evidence to indicate that the additional threat of searches pursuant to administrative warrants is necessary to ensure adequate record-keeping by providers, or to ensure that the records kept are truthful. Further, even if searches of certain provider records were shown to be necessary to uncover fraud, the statute would be too broadly drafted. There is no evidence that review by the State of personal and

that New York has emulated, for an assumption that the security provisions of the statute will be administered improperly. And the remote possibility that judicial supervision of the evidentiary use of particular items

of stored information will provide inadequate protection against unwarranted disclosures is surely not a sufficient reason for invalidating the entire patient-identification program."
*Whalen v. Roe, supra,* 97 S.Ct. at 877–78.

confidential information contained in a psychiatrist's patient files is necessary to prevent fraud. The details of a patient's problems are not necessary to an evaluation of whether a psychiatrist is rendering services in the amount claimed.

The affidavit submitted by Dr. Robert Collis is particularly relevant on this point. Dr. Collis and officials from the Department of Health, Education and Welfare (H.E.W.) agreed upon an audit procedure that satisfied H.E.W.'s needs and protected the confidential information in Dr. Collis's records. As to each patient whose file H.E.W. sought to audit, Dr. Collis reviewed the file and deleted those portions that contained confidential matters. Dr. Collis also reviewed the non-confidential portions of his files with the H.E.W. officials and permitted them to see only the dates of service and other information necessary to verify that services were performed in accordance with his billings.

The State has offered no evidence that a similar procedure could not be used by the Attorney General's office, or that it would be inadequate to meet the State's needs. Were the State to follow such a procedure and, based upon its review of non-confidential information, determine that a reasonable suspicion existed that a provider was defrauding the State, a warrant to inspect more sensitive records might be available. The court expresses no opinion at this time as to the constitutionality of such a procedure, or the standards to be met in seeking such a warrant. Nevertheless, the availability of this and other less intrusive means to achieve the compelling interest served by Section 8 casts considerable doubt on that statute's constitutionality.

The State contends that Section 8 is necessary to ensure records are available "to enable another provider to determine the proper course of treatment in emergencies." The short answer is that the State has no more interest in requiring that such records are available as to Medicaid beneficiaries than as to anyone else who has received psychiatric counseling. Lack of ability to afford psychiatric care does not make it more or less likely that, in an emergency, some different psychiatrist may be treating an individual. Further, the State's argument would appear to support a requirement that records be maintained and made available as to every person receiving psychiatric counseling. That such a requirement would violate the right to privacy is beyond dispute.

Furthermore, there is no evidence that the administrative warrant procedure in any way furthers the State's purported interest in emergency availability of records. It may in fact do precisely the opposite. Psychiatrists may be disinclined to record in their files extremely personal, sensitive confidences of a patient if they know those files may be reviewed and copied by state officials at any time. The threat of searches may therefore decrease the likelihood that the very information most valuable to another treating psychiatrist, a history of the patient's emotional and mental problems, will be available.

Finally, the State urges that the administrative warrant procedure furthers the State's interest in ensuring that quality medical care is provided to Medicaid beneficiaries. Again, the short answer is that the State has no more interest in ensuring the quality of care provided Medicaid beneficiaries than that provided patients who pay. The states have uniformly chosen to pursue that interest by regulating the licensing of medical practitioners and medical facilities. There is no evidence that the quality of care provided to Medicaid beneficiaries is less effectively regulated than other care. Nor does the legislative history of Act 105 suggest that regulation of the quality of medical care was one of its purposes.

The State has not claimed that the Attorney General's office is prepared to evaluate the quality of psychiatric care being provided, based on any review of therapeutic notes, patient history forms, or diagnoses, or that these materials are or could be referred to a third-party for evaluation. The court does not believe Section 8 was intended to or does assure the quality of psychiatric care provided to Medicaid beneficiaries.

The court does not doubt that Section 8 was enacted in an effort to prevent widespread fraud in the Medicaid program. However, Section 8 intrudes significantly into the patients' right to make decisions regarding psychiatric care in a manner that is unnecessary to achieve the State's commendable purposes. For that reason, the court concludes there is a substantial probability that plaintiffs will succeed on the claim that Section 8 violates the right to privacy.

### B.

The second strand of the right to privacy is the right to confidentiality, "the individual interest in avoiding disclosure of personal matters." *Whalen v. Roe, supra,* 429 U.S. at 599, 97 S.Ct. at 876. There can be little doubt that the information contained in a psychiatrist's patient files will include personal matters. *See supra* pages 1037–1038. The problem for the court is to determine the proper standard of review under this strand of the right to privacy, and to apply that standard to this case. Previous cases offer only sparse guidance.

In *Whalen v. Roe, supra,* plaintiffs challenged New York's prescription reporting requirement on the ground that it violated their right to confidentiality of personal information. The Supreme Court did not discuss the standard to be applied to public disclosure of the prescription information, because it determined that the chance of such disclosure was minimal. 97 S.Ct. at 877–78. The Court distinguished disclosure of the information to employees of the state, who were under a duty to keep it confidential, from disclosure to the public. Disclosure to the State was held not to be "meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care." 97 S.Ct. at 878. Requiring disclosure of private medical information to representatives of the state did not "automatically" amount to an impermissible invasion of privacy. *Id.*

*Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), involved the Presidential Recordings and Materials Preservation Act, Pub.L. 93–526, Title I, note following 44 U.S.C. § 2107, which purported to cover disposition of the 42 million pages of material and 880 tape recordings accumulated by ex-President Nixon. The Act provided that professional archivists would examine all the materials and cull all personal material from the documents. Plaintiff challenged the constitutionality of the Act. Although recognizing that Nixon had a legitimate expectation of privacy in some of the materials, the Court balanced the interests involved and upheld the law. 97 S.Ct. at 2796–2802.

Although the Supreme Court has not offered particularly explicit guidance, this court believes that the appropriate test under the confidentiality strand of the privacy right, the test implicitly used by the Supreme Court in *Whalen* and *Nixon*, is to balance the state interests served by a regulation against the intrusion into an individual's privacy. *Accord, Plante v. Gonzalez, supra,* 575 F.2d at 1134. Application of a traditional balancing test to the confidentiality strand of the privacy right is consistent with the Court's use of the "compelling interest" standard where the autonomy strand of the right to privacy is burdened. Where the Court has recognized a protected zone of autonomy, it has done so because the matters falling within that zone affect the most fundamental personal decisions and relationships. *See Carey v. Population Services Intern., supra,* 97 S.Ct. at 2017. The requirement that a burdensome regulation be justified by a compelling state interest reflects the great weight on the privacy end of a traditional balancing test resulting from the highly sensitive nature of the protected zone. *See Plante v. Gonzalez, supra,* 575 F.2d at 1134 n.23. Similarly, as the sensitivity of the personal information disclosed, and hence the intrusion on the right to confidentiality, increases, the burden on the state to justify a disclosure will increase under the balancing test.

Several cases cast some light on application of a balancing test to the confidentiali-

ty interest. In *Plante v. Gonzalez, supra,* Judge Wisdom considered the constitutionality of the Florida "Sunshine Amendment," requiring that certain elected officials make public detailed information about their personal finances. The court recognized four important state interests in the amendment: the public's "right to know" an official's financial interests, deterrence of conflicting interests and corruption, creation of public confidence in Florida's officials, and assistance in detecting and prosecuting officials who have violated the law. The court determined that the amendment significantly promoted these interests. Balancing these interests against the State officials' interests in financial privacy, the court upheld the law. Recognizing that the officials had some interest in nondisclosure, the court noted:

> "The extent of the interest is not independent of the circumstances. Plaintiffs in this case are not ordinary citizens, but state senators, people who have chosen to run for office. That does not strip them of all constitutional protection. * * * It does put some limits on the privacy they may reasonably expect.".

575 F.2d at 1135. The court was concerned, therefore, with the importance of the state interests and necessity of the challenged regulations to their furtherance, as well as the nature of the disclosures and the privacy expectations of the aggrieved individuals.

In *McKenna v. Fargo, supra,* the court considered the constitutionality of psychological testing used by Jersey City to screen applicants to its fire department. The court recognized that the Supreme Court in *Whalen* held constitutional a statute that required disclosure of personal information regarding drug prescriptions to state employees. But the court also stressed the Supreme Court's recognition in *Whalen* of a privacy interest in not disclosing personal information to government employees, as well as to the public. The nature of the disclosures in *McKenna* required that the state justify the testing by showing it advanced compelling state interests and was narrowly drawn to further only those interests.

"The private information disclosed to State employees in *Whalen* consisted of the patient's name, age, address, and use of a certain drug. In this case, the degree and character of the disclosure is far greater and more intrusive. The evaluation looks deeply into an applicant's personality, much as a clinical psychologist would if requested to do so by an applicant. Fire-fighter candidates are called upon to reveal the essence of their experience of life, the collective stream of thoughts and feelings that arise from the ongoing dialogue which individuals carry on between the world and themselves in the privacy of their being. It involves a loss of the power individuals treasure to reveal or conceal their personality or their emotions as they see fit, from intimacy to solitude."

451 F.Supp. at 1380–81. The unique personal character of the disclosures distinguished the case from *Whalen.*

> "While, in this case, as in *Whalen,* the facts show there has not been any public disclosure, *the character and amount of information given to the Government alone is itself an intrusion on the privacy interest in nondisclosure of personal information to government employees* recognized in *Whalen.*"

Id. at 1381. (emphasis added).

The court in *McKenna* concluded that the state's interest in the testing nevertheless outweighed the intrusion.

> "Because fire fighting, like police work, involves life-endangering situations, the State interest is of the highest order. Plaintiffs lose sight of the fact that a fireman who loses emotional control endangers his own life as well as those of other firemen. . . . The life of a community, as well, depends, at the most basic level, on those whose job it is to protect the community from physical forces . . . ."

*Id.* The court reiterated, however, that the testing had consistently to be implemented in a manner that served only the compelling

interest of protecting lives which justified the significant burden it imposed on the applicants' privacy. *Id.* at 1382.

Similarly, in *Caesar v. Mountanos, supra,* the Court of Appeals for the Ninth Circuit sustained an exception to the psychotherapist-patient privilege under California Evidence Code Section 1016 because the State's "compelling need to ensure the ascertainment of the truth in court proceedings" outweighed the "substantial" privacy rights invoked. 542 F.2d at 1068–70. The court placed considerable emphasis on the fact that the plaintiff, by placing her mental and emotional condition in issue, had herself breached any confidential relationship and revealed her emotional problems. *Id.* at 1070.

Thus, both cases that have discussed the right to confidentiality inherent in the psychotherapist-patient relationship have held that a law requiring disclosure of information obtained as a result of that relationship is constitutional only when the compelling state interest served by such law outweighs the individual's right to retain the confidentiality of that information. *McKenna v. Fargo, supra* ; *Caesar v. Mountanos, supra.* The court believes a similar application of the balancing test is appropriate here. The information to be disclosed to the State pursuant to Section 8's warrant provision will include an individual's most intimate thoughts, feelings and conduct.

■ As discussed above, the Attorney General proffers several important State interests to justify these disclosures. The court finds that the disclosure of this highly personal information in the manner provided by Section 8 is not necessary to the State's pursuit of these interests. *See supra* pages 1040–1043. The State could easily fashion a statute that would strike a more appropriate and more constitutional balance between the right to privacy and protection of the Medicaid program.

Further, the court does not believe that plaintiffs or their patients have waived any interest in confidentiality by participating in the Medicaid program. Unlike the patient in *Caesar,* plaintiffs have not voluntarily made public any personal information of the sort contained in a psychiatrist's files. To the extent it might be argued that the psychiatrists have waived any of their own rights by participating in the program and agreeing to make records available, the court does not believe they have or could have waived the rights of their patients. Finally, it would be unreasonable to hold that an indigent patient who signs a form stating that a provider may release certain medical records to the State exercises a knowing waiver of his interest in not having his most personal confidences to the psychiatrist disclosed. It is far more likely that, if he reads the form at all, a patient would assume that the records would include only billing information and similar non-confidential matters.

The court therefore concludes that there is a high probability that plaintiffs will succeed on the claim that Section 8 violates the right to avoid unjustified disclosure of personal information.

### 2. The Merits—The Fourth Amendment

#### A.

■ The Supreme Court has delineated the analysis the court must apply to determine whether the issuance of administrative warrants pursuant to the "valid public interest" standard of probable cause in Section 8 violates the Fourth and Fourteenth Amendments. In *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Court wrote:

"The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law-enforcement agents, in order ' "to safeguard the privacy and security of individuals against arbitrary invasion. . . ." ' *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), quoting *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Thus, the permissibility of a particular law-enforcement practice is judged by balancing its intrusion on the individual's

Fourth Amendment interests against its promotion of legitimate governmental interests. Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test. In those situations in which the balance of interests precludes insistence upon 'some quantum of individualized suspicion,' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field,' *Camara v. Municipal Court, supra,* at 532, 87 S.Ct. 1727."

99 S.Ct. at 1396–97. These dictates of the Fourth Amendment protect commercial premises as well as homes, and they apply to civil as well as criminal investigations. *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978).

■ The "valid public interest" standard of probable cause prescribed by Section 8 for the issuance of warrants to inspect providers' records fails to meet the test prescribed by *Delaware v. Prouse.* The standard does not satisfy even the "minimum" requirement that the facts upon which an inspection is based be measurable against "an objective standard." *Id.* 99 S.Ct. at 1396. Further, balancing the intrusion on the psychiatrist's expectations of privacy against the statute's rather limited promotion of legitimate state interests, the court concludes that "some quantum of individualized suspicion" ought to be required before a warrant may issue to search and seize a psychiatrist's confidential medical files. *Id.*

The Court in *Delaware v. Prouse* addressed the question whether it is an unreasonable seizure under the Fourth and Fourteenth Amendments to stop an automobile, being driven on a public highway, for the purpose of checking the driving license of the operator and the registration of the car, where there is neither probable cause to believe nor reasonable suspicion that the car

is being driven contrary to law, or that either the car or any of its occupants is subject to seizure or detention. 99 S.Ct. at 1394. The Court recognized the State's "vital interest" in ensuring that only licensed persons operate motor vehicles and that vehicles are fit for safe operation. *Id.* at 1398. But the Court noted the necessity of addressing another question: whether the discretionary spot check is "a sufficiently productive mechanism" in the service of these interests to justify the intrusion upon Fourth Amendment interest which such stops entail. The Court concluded that, given the alternative mechanisms available, the incremental contribution to highway safety of the random spot check could not justify the procedure. *Id.* at 1399.

"To insist upon neither an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion 'would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulable hunches . . . .'"

*Id.* at 1400.

A similar analysis applies to the instant case. The State does have a compelling interest in ensuring that services and supplies for which it is being billed under the Medicaid program have been provided, and that the program is not being defrauded. But the question remains whether the administrative inspection scheme of Section 8 is a sufficiently productive mechanism to serve that interest to justify the intrusion upon Fourth Amendment interests that the inspections entail. The court concludes that it is not.

■ As discussed at length above, the privacy interests of both a psychiatrist and his patient in the psychiatrist's confidential medical files are very important. Confidentiality of psychiatrist-patient communications is essential to preserve an individual's freedom of choice in deciding whether to seek psychiatric care, to encourage a patient to volunteer sensitive personal information in the course of treatment, and to

enable a psychiatrist to conduct such treatment in the best possible manner. *See* pages 1038–1039, *supra.* The psychiatrist whose office and records are searched has a Fourth Amendment expectation of privacy in the medical files even though the patients themselves may not have such reasonable expectation as to records they do not possess. *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1979).

Given the availability of other, less intrusive means to pursue the proffered state interests, the court is not persuaded that any limited contribution the issuance of warrants under Section 8 may make toward the prevention of fraud justifies the significant intrusion on Fourth Amendment interests it effects.

In *Delaware v. Prouse*, the Court recognized that there are certain "relatively unique circumstances" in which consent to regulatory restrictions, including warrantless inspections, is "presumptively concurrent" with participation in the regulated enterprise. *Delaware v. Prouse, supra*, 99 S.Ct. at 1400, *citing United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), and *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). The Court also noted that, where the balance of interests does not warrant insistence upon "some quantum of individualized suspicion," regulatory inspections may be undertaken pursuant to previously specified "neutral criteria." *Id.* 99 S.Ct. at 1396, 1400, *citing Marshall v. Barlow's, Inc., supra*, 98 S.Ct. at 1820. Defendants contend that regulatory inspections pursuant to Section 8 fall within one or both of these exceptions to the usual requirement that some individualized, articulable suspicion accompany a search or seizure. The court disagrees.

In *Colonnade Catering Corp. v. United States*, the Court indicated that Congress could authorize warrantless inspections of liquor dealers, because the liquor industry had been "long subject to close supervision and inspection." 90 S.Ct. at 777. In *United States v. Biswell*, the Court upheld warrantless inspections of dealers in firearms

under the Gun Control Act of 1968. The Court considered inspection "a crucial part of the regulatory scheme" since it assured that weapons were distributed through regular channels, made possible prevention of sales to "undesirable customers," and aided in prevention of violent crime. 92 S.Ct. at 1596. The Court placed particular emphasis on the fact that the inspection scheme posed only a limited threat to a dealer's justifiable expectations of privacy, because the dealer had chosen "to engage in this pervasively regulated business and to accept a federal license." *Id.*

The Supreme Court has on several recent occasions emphasized that cases such as *Colonnade* and *Biswell* are the exception and arise only in certain unique circumstances. *Delaware v. Prouse, supra*, 99 S.Ct. at 1400; *Marshall v. Barlow's, Inc., supra*, 98 S.Ct. at 1820–21. In *Barlow's*, the Secretary of Labor urged that warrantless searches pursuant to the Occupational Health and Safety Act (OSHA) were justified under the rationale of *Biswell* and *Colonnade*. The Court disagreed:

> "[*Biswell* and *Colonnade*] are indeed exceptions, but they represent responses to relatively unique circumstances. Certain industries have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise. Liquor (*Colonnade*) and firearms (*Biswell*) are industries of this type; when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation."

98 S.Ct. at 1820–21. The Court concluded that "the degree of federal involvement in employee working circumstances has never been of the order of specificity and pervasiveness that OSHA mandates." *Id.* at 1821.

The Court thus concluded that, where an individual chooses to employ persons in a business that may endanger the health or safety of those employees, even though government regulation of working conditions has at least for the past century been

extensive, the "unique circumstances" that justified warrantless inspections in the context of liquor and firearms do not exist. In light of the Court's ruling in *Barlow's*, it would be difficult to conclude that when a psychiatrist agrees to provide care to a person receiving Medicaid benefits, in spite of the history and continued necessity of confidentiality in the psychiatrist-patient relationship, those "unique circumstances" are created. The Supreme Court has not been willing so readily to extend the rationale of *Biswell* and *Colonnade*.

Defendants also contend that the balance of interests in this case precludes insistence upon individualized suspicion, and that the "valid public interest" standard of probable cause is justified by *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and cases following its rationale. In *Camara*, the Supreme Court held unconstitutional warrantless inspections of residences by housing authorities in San Francisco. 87 S.Ct. at 1733. The Court rejected, however, the contention that warrants to inspect residences for housing code violations should issue only upon a showing of probable cause, in the traditional sense, to believe that a particular dwelling contains violations of the code. Balancing the state's need to inspect to prevent dangerous or unhealthful conditions against the "relatively limited invasion of the urban citizen's privacy," the Court concluded that routine periodic inspection of all structures in an area was reasonable. *Id.* at 1734–35. "Probable cause" to issue a warrant would exist "if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." *Id.* at 1736. The Court emphasized that "reasonableness" was the ultimate standard to determine whether a "valid public interest justifies the intrusion contemplated." *Id.*

Section 8 of Act 105 defines probable cause as a showing that

> "a valid public interest [exists] in the effective enforcement of this chapter or rules hereunder, sufficient to justify ad-

ministrative inspection of the area, premises, building, conveyance or records in the circumstances specified in the application for the warrant."

The language of Section 8 appears to have been based upon the Court's opinion in *Camara*. *See* Testimony of the Attorney General on S.B. No. 2609, p. 15. Defendants contend that in light of *Camara* issuance of warrants pursuant to this definition of probable cause is "reasonable" under the Fourth and Fourteenth Amendments.

The defendants make two mistaken assumptions. The first is that, as in *Camara*, the issuance of warrants in the absence of individualized suspicion is reasonable in the circumstances of this case. The second mistaken assumption is that, were the court to apply the standard enunciated in *Camara*, Section 8 would meet that standard.

The Court in *Camara* did not determine the appropriate elements of "probable cause" for the issuance of any administrative inspection warrants, but only for those involved in that case. The Court explicitly recognized that each case must be determined according to the balancing test set forth most recently in *Delaware v. Prouse*, *supra*, 99 S.Ct. at 1396–97, weighing the enforcement needs of the statute against the nature and extent of the intrusion upon legitimate expectations of privacy. 87 S.Ct. at 1735–36. *See Marshall v. Barlow's, Inc.*, *supra*, 98 S.Ct. at 1825. Three factors were determinative of the balance in *Camara*: the "long history of judicial and public acceptance" of area inspections; the fact that the "public interest demands that all dangerous conditions be prevented or abated," and that it was unlikely that any other techniques could achieve that result; and the fact that "because the inspections are neither personal in nature nor aimed at the discovery of evidence of crime," they involved a limited invasion of privacy. 87 S.Ct. at 1735. Not one of these factors is present here.

There is no history of judicial, legislative or public acceptance of government access to confidential communications between a psychiatrist and his patient. To the con-

trary, courts, legislators and commentators have long agreed on the need to protect those communications from disclosure. *See, e. g., Caesar v. Mountanos, supra*, 542 F.2d 1064 (9th Cir. 1976); *Taylor v. United States, supra*, 95 U.S.App.D.C. 373, 222 F.2d 398 (D.C.Cir.1955); California Evidence Code § 1016; J. Katz, J. Goldstein, & A. Dershowitz, *Psychotherapy, Psychoanalysis and the Law, supra* ; Guttmacher and Weinhofen, *Psychiatry and the Law, supra*. While the public interest demands that fraud be prevented in the administration of the Medicaid program, there is no evidence that other, less intrusive techniques are not available to the State to achieve that end. Finally, the inspections contemplated by Section 8 would encompass review and copying of files likely to contain highly personal matters. The invasion of privacy is anything but limited.

The cases following *Camara* that have indicated the appropriateness of a standard of "probable cause" based on something less than individualized suspicion have involved factors similar to those present in *Camara* and absent here. In *Marshall v. Barlow's, Inc.*, the Court stated that, in the context of administrative searches of employment facilities to inspect for violations of OSHA,

> "probable cause justifying the issuance of a warrant may be based not only on specific evidence of an existing violation but also on a showing that 'reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with to a particular [establishment].' *Camara v. Municipal Court, supra*, 387 U.S. at 538, 87 S.Ct., at 1736."

98 S.Ct. at 1824–25. In *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 1948 n.5, 56 L.Ed.2d 486 (1978), the Court concluded that the same standard of "probable cause" would apply to administrative searches to enforce local building, health, or fire codes. *Tyler* and *Barlow's* each involved administrative searches for purposes nearly identical to that served by the searches in *Camara*, protection of the health and safety of the public. In each case, the Court balanced the government's compelling interest in the challenged method of inspection against what it deemed to be relatively limited invasions of the occupants' expectations of privacy.

Defendants rely on several cases which, applying the principles of *Colonnade, Biswell*, and *Camara*, have upheld administrative searches based upon Section 880(d) of the Controlled Substances Act. *United States v. Prendergast*, 585 F.2d 69 (3d Cir. 1978); *United States v. Schiffman*, 572 F.2d 1137 (5th Cir. 1978); *United States v. Goldfine*, 538 F.2d 815 (9th Cir. 1976). The language of Section 880(d) is identical to the language of Section 8 in its definition of "probable cause." Nevertheless, the reasoning and holding of those cases is not applicable here, primarily because the governmental interests and expectations of privacy to be balanced are different.

In *Goldfine* and *Prendergast*, the issue before the courts was whether the administrative searches of pharmacies pursuant to a reduced standard of probable cause were subterfuges in aid of a criminal investigation. 585 F.2d at 70; 538 F.2d at 818–19. The courts concluded that, so long as the extent of the intrusion was limited to the purposes specified in the statute, no showing under traditional standards of probable cause was necessary. 585 F.2d at 71; 538 F.2d at 819.

In *Schiffman*, the court confronted the constitutionality of the "valid public interest" standard of probable cause in Section 880(d). In upholding the statute, the court relied on the similarity between the pharmaceutical industry and the liquor and firearms industries discussed in *Colonnade* and *Biswell*.

> "The pharmaceutical industry is a 'pervasively regulated business' like the liquor and gun industries. * * * Dealers in drugs, like dealers in firearms, are required to be federally licensed. The dealer accepts the license knowing that § 880 authorizes inspection of his business. Inspections are essential to the federal regulatory scheme to ensure that drugs are distributed only through 'regular channels' and not diverted to illegal uses.

The inspections pose only a limited invasion of the dealer's privacy interest, since the statute limits them in time, place, and scope."

572 F.2d at 1142. The court also noted that the language of Section 880(d) followed the language in *Camara* to the effect that

"If a valid public interest justifies the intrusion contemplated then there is probable cause to issue a suitably restricted search warrant."

572 F.2d at 1142, *quoting Camara v. Municipal Court, supra,* 87 S.Ct. at 1736; *see also United States v. Goldfine, supra,* 538 F.2d at 819.

■■■ This court has already concluded that administrative searches of psychiatrists' confidential files may not be justified as regulation of a "pervasively regulated business" similar to liquor or firearms dealing. The court also believes that the *Schiffman* court's reliance on the "valid public interest" language of *Camara* is misplaced. The Court in *Camara* did not intend that a "valid public interest" would justify any intrusion pursuant to an administrative warrant. Rather the Court's discussion of a "valid public interest" was another way of stating that the "reasonableness" of a search is to be determined from the circumstances of each case. The relevant question is *whether* the valid public interest served is sufficient to justify the particular intrusion effected. *See Delaware v. Prouse, supra,* 99 S.Ct. at 1399.

■■■ The privacy interests inherent in the psychiatrist-patient relationship are extremely significant, and the intrusion on those interests effected by searches based on the mere existence of a "valid public interest" in the enforcement of the act is substantial. Further, the searches, including as they do the reading and copying of confidential medical files, are not necessary to achieve the purposes the State offers in their justification. Balancing the significant privacy interests against the limited enforcement needs involved, the court concludes that some showing of an "individualized, articulable suspicion" should be required before a warrant issues to search or seize a psychiatrist's confidential medical records.

Even if the court were to conclude that this case was one in which the balance of interests precludes insistence upon such a showing of individualized suspicion, the administrative warrant provisions of Section 8 would not be saved. *Camara* and the cases following its principles make clear that something more specific is required than a general showing of a "valid public interest" in the enforcement of the statute in question. Section 8 does not satisfy the requirement that regulatory inspections "unaccompanied by any quantum of individualized, articulable suspicion must be undertaken pursuant to previously specified 'neutral criteria.'" *Delaware v. Prouse, supra,* 99 S.Ct. at 1400.

In *Camara,* the Court stated that "probable cause" would exist:

"[I]f reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling. Such standards, which will vary with the municipal program being enforced, may be based upon the passage of time, the nature of the building (e. g., a multi-family apartment house), or the condition of the entire area, but they will not necessarily depend upon specific knowledge of the condition of the particular dwelling."

87 S.Ct. at 1736. The Court elaborated further on the nature of the standards required in *Barlow's.*

"A warrant showing that a specific business has been chosen for an OSHA search on the basis of a general administrative plan for the enforcement of the Act derived from neutral sources such as, for example, dispersion of employees in various types of industries across a given area, and the desired frequency of searches in any of the lesser divisions of the area, would protect an employer's Fourth Amendment rights."

98 S.Ct. at 1825. It is clear that the standards contemplated by the Court require something more than a conclusory showing that a "valid public interest" exists.

The purpose of requiring a warrant to conduct an administrative search is "to assure that an individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.' *Camara v. Municipal Court, supra*, 387 U.S. at 532, 87 S.Ct. at 1733." *Delaware v. Prouse, supra*, 99 S.Ct. at 1396–97. A warrant can serve that purpose only if it is issued on the basis of some "specific neutral criteria." *Marshall v. Barlow's, Inc., supra*, 98 S.Ct. at 1826. The facts upon which an intrusion is based must be capable of measurement against some "objective standard." *Delaware v. Prouse, supra*, 99 S.Ct. at 1396. To permit a warrant to be issued on the basis of a field officer's conclusion that a search is in the public interest would be to return unbridled discretion to the hands of that field officer.

In *Barlow's*, the Court stated that a warrant must be issued "pursuant to an administrative plan containing specific neutral criteria.[20]" 98 S.Ct. at 1826. The footnote to that phrase implicitly disapproves use of a warrant similar to that used by the State in this case:

"[20] The application for the inspection order filed by the Secretary in this case represented that 'the desired inspection and investigation are contemplated as part of an inspection program designed to assure compliance with the Act and are authorized by Section 8(a) of the Act.' The program was not described, however, or any facts presented that would indicate why an inspection of Barlow's establishment was within the program."

*Id.* at 1826 n.20. The Court was concerned that administrative inspection warrants not be merely "rubber-stamped" on the basis of an allegation that the interests of enforcement would be served by a given inspection. Rather, the affidavit in support of the warrant should have described the criteria used under the inspection program to determine what establishments would be inspected, and stated facts to demonstrate that the establishment in question fell within those criteria.

In *In Matter of Northwest Airlines*, 437 F.Supp. 533 (E.D.Wis.1977), the Occupational Health and Safety Administration sought to establish probable cause by showing that the desired inspection was "part of an inspection and investigation designed to assure compliance with the Act." *Id.* at 536. The court interpreted *Camara* to require that the issuing officer be informed of the criteria being used to determine if a search should be conducted, so that the issuing officer, and not the officer in the field, could determine the reasonableness of those criteria, and whether they had been applied in a neutral manner to a particular establishment. *Id.* "A valid public interest" is not an objective criterion the reasonableness or neutral application of which an issuing officer could determine.

In *Marshall v. Weyerhauser Co.*, 456 F.Supp. 474 (D.N.J.1978), the court relied on *Camara* and *Barlow's* in rejecting an application for an inspection warrant. The court compared the affidavit before it with one approved by another court:

"[In *Reynolds Metals Co. v. Secretary of Labor*, 442 F.Supp. 195 (W.D.Va.1977)], the prior absence of inspection of the Bristol plant, together with . . . a 'rational and non-discriminatory' plan of inspection, established probable cause for an inspection warrant.

. . . . .

. . . Without comparable information in this affidavit to describe the administrative standards being followed, there can be no meaningful judicial review of the discretion being exercised by OSHA officials. Approval of a search warrant based on this affidavit would amount to a 'rubberstamp' such as was impliedly rejected by the *Barlow's* Court."

456 F.Supp. at 481–82.

These cases are consistent with the Court's statements in *Delaware v. Prouse* that the facts upon which an intrusion is based must be measurable against "an objective standard," and that regulatory inspections must be undertaken pursuant to "previously specified 'neutral criteria.'" 99

S.Ct. at 1396, 1400. Section 8 neither establishes such an objective standard or neutral criteria nor requires that standards be established by the administering agency. Thus, even if the inspections contemplated by Section 8 could be authorized in the absence of individualized, articulable suspicion, they can not be authorized on the basis of the "valid public interest" standard of probable cause set forth in the statute.

The court concludes that plaintiffs have demonstrated a strong probability that they will succeed on the merits. They have therefore established the "irreducible minimum" chance of success necessary to warrant issuance of a preliminary injunction. *See Benda v. Grand Lodge of Intern. Ass'n, supra,* 584 F.2d at 315, 318.

### 3. *Irreparable Injury*

The affidavits submitted by plaintiffs, uncontradicted as they are by defendants, establish a substantial possibility of irreparable injuries to plaintiffs and their patients. The provisions of Section 8 authorizing the issuance of warrants to search and seize confidential medical records on the basis of a showing of a "valid public interest" may inhibit the willingness of individuals to seek psychiatric care and to be candid with their psychiatrists, and the ability of the psychiatrists to provide the best possible analysis and treatment. The failure of an individual to seek care or to receive adequate care may result in serious and irreversible harm to that individual.

Further, irreparable injury would exist even if the threat of searches would not have this inhibiting effect on psychiatric care. The disclosure of the highly personal information contained in a psychiatrist's files to government personnel is itself a harm that is both substantial and irreversible. "When a legitimate expectation of privacy exists, violation of privacy is harmful without any concrete consequential damages." *Plante v. Gonzalez, supra,* 575 F.2d at 1135. Irreparable harm to plaintiffs' patients' interest in nondisclosure of personal information would inevitably flow from continued enforcement of Section 8.

The State, on the other hand, will suffer only a minimal lessening of its ability to investigate and prevent fraud in the Medicaid program. The State continues to have available to it procedures for requesting production of documents and imposing penalties for failure to do so. In addition, where the State has probable cause, in the traditional sense, to believe that violations exist, it may procure criminal search warrants. The legislature may also, of course, attempt to enact substitute provisions to provide for constitutionally permissible administrative inspection warrants.

Thus, because the injury to the State is limited and not necessarily irreparable, while that to plaintiffs and their patients is substantial and irreparable, the balance of hardships tips strongly in favor of plaintiffs. They have demonstrated sufficient possibility of irreparable harm to warrant the issuance of a preliminary injunction.

### ORDER

On the basis of the foregoing, which shall constitute the court's Findings of Fact and Conclusions of Law,

IT IS ORDERED that defendants' motion for summary judgment is denied.

IT IS FURTHER ORDERED that:

(1) Defendants, their agents, representatives and employees, and all persons acting in concert or at the direction of any of them, are enjoined and restrained from enforcing the terms of Section 8 of Act 105 of the 1978 Session Laws of the State of Hawaii; and

(2) Defendants are ordered to deliver to the Clerk of the Court all records searched and seized under the terms of the administrative inspection warrant issued against plaintiff Willis, and to provide certification that no copies of these records remain within the custody or control of the State of Hawaii or any of the defendants or their agents.

The foregoing order shall remain in effect until further order of this court.