704 F.2d 661
 10 Ed. Law Rep. 472
 Lorraine GARGIUL, Plaintiff-Appellant,
v.
Virgil E. TOMPKINS, Individually and as District
Superintendent of Liverpool Central School District, James
Johnson, Individually and as Acting Superintendent of
Liverpool Central School District, Dennis Jones,
Individually and as Coordinator of Personnel of Liverpool
Central School District, Dr. Paul Day, Individually and as
Chief Medical Inspector for the Liverpool Central School
District, F. Robert Kolch, Individually and as Clerk of the
Board of Education of the Liverpool Central School District,
Arthur D. Little, Bruce C. Vojt, Emilio Chasse, Doris Ann
Connor, David A. Files, Marie Hartwell, Richard J. Hayko,
Toni Anne Morris, Lloyd J. Spafford, as Individuals and as
Members of the Board of Education of the Liverpool Central
School District, the Board of Education of the Liverpool
Central School District, Liverpool, New York, and Arnold
Dettor, as Hearing Officer appointed pursuant to New York
State Education Law, Defendants-Appellees.
 No. 483, Docket 82-7482.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 19, 1982.
Decided March 29, 1983.
 
 1
 Alfred R. Tyminski, Marcellus, N.Y., for plaintiff-appellant.
 
 
 2
 Kenneth A. Windstein, O'Hara, Lahm & Felice, Liverpool, N.Y., for defendants-appellees.
 
 
 3
 Before FEINBERG, Chief Judge, OAKES, Circuit Judge, and TENNEY, District Judge.*
 
 
 4
 TENNEY, Senior District Judge.
 
 
 5
 Lorraine Gargiul, formerly a tenured schoolteacher with the Liverpool Central School District, appeals from an order of summary judgment entered May 17, 1982 by Roger J. Miner, Judge, of the District Court for the Northern District of New York. Judge Miner dismissed Gargiul's Sec. 1983 action against Virgil E. Tompkins, the District Superintendent of the Liverpool Central School District, various officials of the school district, and the Board of Education and its members, on the ground that it failed to state a claim upon which relief could be granted. Gargiul contends that the School Board infringed her constitutional rights by suspending her, and subsequently by dismissing her, for refusing to be examined by a male school district physician. She seeks reinstatement, back pay, and damages for injury to her reputation. Because we conclude that Gargiul's constitutional challenge to her dismissal is barred by collateral estoppel, we affirm the district court's dismissal of that claim. However, for the reasons set forth below, we reverse with respect to the dismissal of Gargiul's constitutional challenge to her suspension without pay.
 
 
 6
 Since this is an appeal from a judgment of dismissal, we accept as true the facts alleged in the complaint. Kirshner v. United States, 603 F.2d 234, 236 (2d Cir.1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274, cert. denied, 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979); Murray v. City of Milford, 380 F.2d 468, 470 (2d Cir.1967).
 
 Background
 
 7
 Appellant Lorraine Gargiul was a tenured kindergarten teacher in the Liverpool Central School District.[1] In November 1974 she took an extended sick leave because of a back ailment. On February 5, 1975 the Superintendent of Schools, Virgil Tompkins, notified Gargiul that she should report to the school district physician, Dr. Paul Day, for a physical examination. In response, Gargiul informed Tompkins that she would be able to return to work on March 17, 1975, and submitted a certificate from her own physician. Gargiul refused, however, to make an appointment with Dr. Day. She explained that she had always gone to women physicians and that it was against her "creed" to be examined by a male physician. She offered instead to go, at her own expense, to any woman physician selected by Tompkins or recommended by a local medical society.
 
 
 8
 On March 10, 1975, the Board of Education adopted a resolution requiring Gargiul to be examined by Dr. Day if he felt that a physical examination was necessary after reviewing her medical records. The Board suspended Gargiul without pay effective March 17, 1975 until Dr. Day could determine whether she was physically able to return to her teaching position.
 
 
 9
 It was apparently not until the summer that Dr. Day decided that an examination would be necessary. Accordingly, in a letter dated July 30, 1975 James R. Johnson, the Acting Superintendent of Schools, directed Gargiul to report to Dr. Day for a physical examination. Gargiul reiterated her refusal to be examined by a male physician and repeated her offer to be examined by any woman doctor at her own expense.
 
 
 10
 On August 9, 1975, the Board of Education determined that there was probable cause to issue charges against Gargiul of insubordination, based on her refusal to be examined by Dr. Day, and incompetency, based on unfavorable supervisors' reports and parents' complaints.
 
 
 11
 Gargiul appealed her suspension without pay to the Commissioner of Education pursuant to New York Education Law Sec. 310. The Commissioner dismissed her appeal, concluding that because the Board was empowered by New York Education Law Sec. 913[2] to require Gargiul to submit to an examination by Dr. Day, it had not acted arbitrarily or capriciously in suspending her. The Commissioner also rejected Gargiul's argument that an examination by a male physician was contrary to her creed. In re Gargiul I, 15 Educ.Dept.Rep. 360 (1976). In an application to reopen the Commissioner's decision, Gargiul argued, inter alia, that requiring her to be examined by a male physician violated her constitutional right to privacy. The Commissioner denied her application. He held that Gargiul, having failed to raise her privacy claim earlier, was barred from doing so by the doctrine of res judicata. In re Gargiul II, 15 Educ.Dept.Rep. 520 (1976). Gargiul did not appeal his decision.
 
 
 12
 Between the time that the Commissioner's first and second decisions were handed down, Gargiul commenced an Article 78 proceeding in state court, challenging the Board's resolution to suspend her without pay. The Onondaga County Supreme Court dismissed the proceeding as time barred. The Appellate Division affirmed on that basis, concluding further that the due process claim Gargiul had advanced was without merit. Gargiul v. Board of Education I, 54 A.D.2d 1085, 389 N.Y.S.2d 504 (1976), leave to appeal denied, 41 N.Y.2d 802, 393 N.Y.S.2d 1026, 362 N.E.2d 626 (1977).
 
 
 13
 Meanwhile, a tenure hearing panel was convened and hearings were held concerning the charges against Gargiul. In a decision dated April 4, 1977, a majority of the panel found Gargiul guilty of incompetency and recommended that she be dismissed. The panel also recommended that she be restored to the payroll retroactive to March 17, 1975, and retained on the payroll until the termination of the proceedings against her.
 
 
 14
 In a resolution adopted May 23, 1977, the Board dismissed Gargiul on the ground of incompetency. The Board concluded that in view of its decision to dismiss Gargiul, further punishment for insubordination was unwarranted. However, the Board rejected the hearing panel's recommendation that Gargiul be paid for the period of her suspension, because her suspension without pay was the result of her refusal to be examined by Dr. Day.
 
 
 15
 Finally, Gargiul commenced a second Article 78 proceeding in state court, this time challenging the Board's resolution of May 23, 1977. The Appellate Division held that there was substantial evidence to support Gargiul's dismissal on the ground of incompetency, and thus did not reach the constitutional issues concerning the charge of insubordination. Gargiul v. Board of Education II, 69 A.D.2d 986, 416 N.Y.S.2d 119, leave to appeal denied, 48 N.Y.2d 606, 421 N.Y.S.2d 1031, 397 N.E.2d 760 (1979). The court also concluded that because Gargiul had not directly appealed the Commissioner's decision or joined him in the proceeding, she was bound by his determination and could not relitigate the constitutional issues concerning her suspension without pay. 69 A.D.2d at 986, 416 N.Y.S.2d at 120.
 
 
 16
 Early in the course of the state proceedings, Gargiul commenced this action in federal court pursuant to 42 U.S.C. Sec. 1983 and its jurisdictional counterparts, 28 U.S.C. Secs. 1331 and 1343(3). Her complaint alleges violations of her rights under the first, fourth, ninth, and fourteenth amendments to the Constitution. She claims that the Board's actions impermissibly infringed her right to substantive due process of law, and particularly, her right to privacy. This action, however, was held in abeyance until the termination of all state proceedings. After Gargiul was denied leave to appeal the Appellate Division's decision in Gargiul v. Board of Education II, supra, she moved for partial summary judgment in this action to recover back salary and benefits for the period between March 17, 1975, the date of her suspension and May 23, 1977, the date of her dismissal. In an opinion filed October 30, 1981 the district court denied her motion, on the ground that her refusal to be examined by a male physician was "a mere predilection against male physicians," not protected by her constitutional right of privacy. The court also stated that the Board's actions were not "wholly unreasonable." Defendants then moved for summary judgment on the ground that the complaint fails to state a claim upon which relief may be granted. The district court granted defendants' motion and dismissed the complaint. It is from this dismissal that Gargiul now appeals.
 
 Discussion
 
 17
 We consider at the outset whether Gargiul's claims are barred by the earlier state proceedings under principles of res judicata and collateral estoppel. The traditional rule of res judicata is that a final judgment on the merits of an action precludes the parties from relitigating issues actually raised and determined in that action, as well as issues that could have been, but were not, raised and determined in that action. Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980) (citing Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195 (1877)); Saylor v. Lindsley, 391 F.2d 965, 968 (2d Cir.1968). The traditional rule of collateral estoppel precludes a party from relitigating issues already litigated and determined adversely to him in a prior action, where the adverse determination was necessary to the judgment in that action. Allen v. McCurry, supra, 449 U.S. at 94, 101 S.Ct. at 414 (citing Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979)).
 
 
 18
 Because 28 U.S.C. Sec. 1738[3] requires a federal court to give a state court judgment "the same force and effect as it has in the state in which it was rendered," Mitchell v. National Broadcasting Co., 553 F.2d 265, 274 (2d Cir.1977) (citations omitted), we would ordinarily apply the traditional rule of res judicata--the rule applied by New York courts, Winters v. Lavine, 574 F.2d 46, 55-56 (2d Cir.1978) (collecting cases)--to determine whether Gargiul's claims are precluded. However, this court for policy reasons had declined, in civil rights cases, to apply the "traditional Draconian formulation of the rule of res judicata," id. at 56, despite the Supreme Court's suggestion that the principles of res judicata may be fully applicable in Sec. 1983 actions, Allen v. McCurry, supra, 449 U.S. at 96-97, 101 S.Ct. at 415-16. Thus, while a Sec. 1983 plaintiff may not relitigate constitutional claims actually determined in a prior state court proceeding, Allen v. McCurry, supra; Winters v. Lavine, supra, we have held that a prior state court proceeding does not bar federal court consideration of constitutional claims not actually litigated and determined in that proceeding. Ornstein v. Regan, 574 F.2d 115, 117 (2d Cir.1978); Newman v. Board of Education, 508 F.2d 277, 278 (2d Cir.), cert. denied, 420 U.S. 1004, 95 S.Ct. 1447, 43 L.Ed.2d 762 (1975); Lombard v. Board of Education, 502 F.2d 631, 635-37 (1974), cert. denied, 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975). See Winters v. Lavine, supra, 574 F.2d at 57 (res judicata, applied in this context, "displays the predominant characteristic of the rule of collateral estoppel").
 
 
 19
 In this case, Gargiul claims that the Board violated her constitutional rights by suspending her without pay for refusing to be examined by Dr. Day. She also claims that the Board violated her constitutional rights in dismissing her for incompetency, because the charge of incompetency was motivated by her refusal to be examined by Dr. Day.
 
 
 20
 Gargiul's latter claim is clearly barred by collateral estoppel. She raises here the same argument that she raised before the Appellate Division in Gargiul v. Board of Education II, supra. The Appellate Division concluded that there was substantial evidence to support her dismissal on the independent ground of incompetency. 69 A.D.2d at 986, 416 N.Y.S.2d at 120. The court found, essentially, that Gargiul would have been dismissed for a constitutionally permissible reason regardless of her refusal to be examined by Dr. Day. Therefore, Gargiul may not relitigate the basis, and, in consequence, the constitutionality of her dismissal. See Winters v. Lavine, supra, 574 F.2d at 63-66.
 
 
 21
 Gargiul's challenge to the constitutionality of her suspension without pay stands on somewhat different footing, however. In neither judicial proceeding did the state court address the merits of her substantive due process claims. In Gargiul v. Board of Education I, supra, Gargiul argued that the due process clause of the fourteenth amendment protected her, a tenured teacher, from suspension without pay prior to a final determination of the charges against her. The Appellate Division rejected Gargiul's claim that her due process rights had been violated. 54 A.D.2d at 1087, 389 N.Y.S.2d at 506. While that decision clearly bars Gargiul from relitigating her claim that her suspension without pay violated her procedural due process rights, it is not dispositive of her substantive due process claims, which she did not raise in that proceeding.
 
 
 22
 Gargiul did attempt to raise her substantive due process claims in Gargiul v. Board of Education II, supra. The Appellate Division upheld her suspension without pay on statutory grounds. However, the court concluded that Gargiul's failure to appeal the Commissioner of Education's determination of the constitutionality of her suspension or to join the Commissioner as a party precluded her from relitigating the constitutionality of her suspension without pay. 69 A.D.2d at 986, 416 N.Y.S.2d at 120. Thus, in neither case did the state court determine the merits of Gargiul's substantive due process claims.
 
 
 23
 The decision of the Commissioner of Education, by which the state court held Gargiul bound, rejected most of Gargiul's constitutional arguments on their merits. In re Gargiul I, supra. However, the Commissioner never addressed the merits of Gargiul's claim that her actions were protected by her constitutional right of privacy. She did not raise her privacy claim at the hearing before the Commissioner, and when she advanced it as a basis for reopening his decision, he held that the claim was barred under the doctrine of res judicata. In re Gargiul II, supra. Under the rationale of Lombard v. Board of Education, supra, and its progeny, Gargiul's privacy claim--never actually litigated and determined--should not be precluded.
 
 
 24
 The remaining question, then, is whether this adverse administrative determination of Gargiul's other constitutional claims precludes their relitigation in federal court. In Mitchell v. National Broadcasting Co., supra, we drew a distinction between the res judicata effect accorded to state judicial proceedings and that accorded to state administrative proceedings. We held that res judicata attaches when a claimant "crosses the line between state agency and state judicial proceedings," and pursues his claim "to a final judicial determination." 553 F.2d at 276; see Keyse v. California Texas Oil Corp., 590 F.2d 45, 47 n. 1 (2d Cir.1978). Although Mitchell involved a Sec. 1981 action, considerations that support this distinction--particularly, the desirability of having state administrative agencies attempt conciliation of claims before a lawsuit is filed in federal court--are no less valid here.
 
 
 25
 The facts of this case differ significantly from those of Mitchell, however. In Mitchell, we gave preclusive effect to a state agency determination that had been directly appealed by the plaintiff and affirmed by the state court. We pointed out that
 
 
 26
 [i]t is reasonable to question whether ... a legal determination ... made only by administrative officials, should bar consideration of the complaint by a federal court. But in this case, five judges of New York State's second highest court reviewed the agency's legal finding.
 
 
 27
 553 F.2d at 276. Gargiul, on the other hand, never directly appealed the adverse administrative determination. And, unlike the state court in Mitchell, the state court here never reviewed the Commissioner's legal determination. The state court merely held that Gargiul was bound by the Commissioner's decision, because she had not challenged it on direct appeal or joined the Commissioner in that proceeding. Under these circumstances, Gargiul cannot be said to have "crossed the line" at which res judicata attaches.
 
 
 28
 Furthermore, even where res judicata effect can attach to state administrative proceedings, the doctrine is not mechanically applied. Its application depends on a number of factors, including
 
 
 29
 (1) the effect which such determinations are accorded by the courts of the jurisdiction within which they are made; (2) the type of hearing which is held and the procedures which are followed by the agency; and (3) the intention of the administrative body and the expectations of the parties before it on the question of finality. See Restatement, Judgments Sec. 4 (1942); ALI, Restatement 2d, Conflicts of Laws Sec. 92, and Reporter's Note, at 341 (P.O.D., Pt. I 1967).
 
 
 30
 Mitchell v. National Broadcasting Co., supra, 553 F.2d at 269 (quoting Taylor v. New York City Transit Authority, 309 F.Supp. 785, 791 (E.D.N.Y.), aff'd, 433 F.2d 665 (2d Cir.1970)). Although New York courts would--and did--accord the Commissioner's unappealed decision preclusive effect, other factors would argue against our following suit. In Plano v. Baker, 504 F.2d 595 (2d Cir.1974), we noted that a hearing before the Commissioner of Education is little more than a round table discussion, and we discussed its procedural inadequacies, which include the inability to examine or cross-examine witnesses. Id. at 598 & n. 5. These procedural inadequacies, which led us in Plano to conclude that the Sec. 1983 plaintiff was not required to exhaust his administrative remedy of appeal to the Commissioner, argue against giving his determination preclusive effect. More significant, however, is that here, as in Plano, the constitutional issues raised "lie within the expertise of courts, not the expertise of administrators." Id. at 599 (footnote omitted). Finally, in view of the nature of Gargiul's claim and her employment status at the time of her appeal to the Commissioner, it is doubtful that either party expected that the Commissioner would have the final word on Gargiul's constitutional claims. Accordingly, we hold that Gargiul is not precluded from challenging her suspension without pay on substantive due process grounds.
 
 
 31
 We turn then to the merits of Gargiul's claim. The fourteenth amendment prevents the state from depriving any person of liberty or property without due process of law. Protected property interests are defined not by the Constitution, but by "existing rules or understandings that stem from an independent source such as state law ...." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Gargiul's position as a tenured teacher was indisputably a property interest protected by the fourteenth amendment. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Gargiul was entitled, under New York law, to certain substantive and procedural safeguards against deprivation of that interest. See N.Y.Educ.Law Secs. 3012, 3020, 3020-a (McKinney 1981). Accordingly, principles of substantive due process require that the Board's actions impairing that interest have a rational relation to a proper governmental purpose. See Koch v. Yunich, 533 F.2d 80, 84 (2d Cir.1976). If Gargiul's lengthy suspension without pay resulted from an arbitrary or capricious exercise of the Board's power, her due process rights were violated. See Brenna v. Southern Colorado State College, 589 F.2d 475 (10th Cir.1978); Simard v. Board of Education, 473 F.2d 988, 994 (2d Cir.1973).
 
 
 32
 Appellant maintains that a strict standard of constitutional scrutiny should be applied. She argues that the physician-patient relationship is one of particular intimacy; that her request for an examination by a physician of the same sex was protected by her fundamental, constitutional right to privacy; and that the Board's directive interfering with that right can be justified only by a compelling state interest. We recognize that, in view of the intimate nature of a physical examination by a physician, Gargiul's preference for a physician of the same sex must be considered more than a "mere personal predilection." Consequently, the nature of her preference is necessarily accorded some weight in our determination of the reasonableness of the Board's actions. However, we find it unnecessary to determine whether there is a " 'fundamental' " right to be examined by a physician of the same sex " 'implicit in the concept of ordered liberty.' " Roe v. Wade, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973) (quoting Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)), that may be infringed only with compelling justification. We conclude, in the particular circumstances of this case, that the Board's actions with respect to Gargiul were so unreasonable as to be arbitrary.
 
 
 33
 Appellees maintain that the Board's directive was an entirely reasonable attempt to safeguard the health and welfare of Gargiul's students. There can be no dispute that safeguarding the health and welfare of students is a legitimate governmental objective, and that requiring a medical appraisal of a teacher's physical or mental fitness is rationally related to that objective. Nevertheless, we are convinced that in this instance the Board acted unreasonably in insisting that the medical appraisal be made by Dr. Day. Gargiul notified the Board at the outset that she would not be examined by a male physician. She suggested two alternatives, either of which was sanctioned by New York Education Law Sec. 913. She offered to provide certification of her medical condition from her own physician, or to be examined, at her own expense, by any female physician selected by the Board, or recommended by a local medical society. Thus the Board's interest in getting an independent medical appraisal of Gargiul's condition rather than rely on the reports of Gargiul's own physician could have been served at least as well had it directed Gargiul to a specialist who was female rather than to Dr. Day.[4] Appellees argue further that the Board's insistence that Gargiul be examined by Day was reasonable because the Board has an interest in requiring teachers to be examined by one "particularly qualified expert" who understands the job-related physical requirements which teachers must meet. We find this argument to be without merit, for we are not persuaded that any particular expertise is necessary to understand the physical requirements of a kindergarten or first-grade teacher.
 
 
 34
 In view of Gargiul's offer to go at her own expense to any female physician selected by the Board, rather than to submit to a physical examination by the school district physician, who was male, the Board's actions with respect to Gargiul must be considered arbitrary. Therefore, we conclude that Gargiul's complaint does state a claim against defendants for violation of her substantive due process rights in connection with her suspension without pay.[5]
 
 
 35
 Accordingly, we reverse and remand the judgment of dismissal with respect to this claim. However, we affirm on collateral estoppel grounds the dismissal of Gargiul's constitutional claims concerning her dismissal.
 
 
 36
 OAKES, Circuit Judge (concurring in the judgment):
 
 
 37
 While I concur with Judge Tenney in the result his opinion reaches, I do so on a different ground. I would not reach the substantive due process question but would hold that the plaintiff's complaint that she was suspended for refusal to be examined by a male doctor alleges a violation of her constitutional right to privacy, a right I believe is part of a larger constitutional right of "personhood."[1] The right of privacy, first recognized by the Supreme Court in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), has been fleshed out to some extent on an ad hoc basis, 1 N. Dorsen, P. Bender, & B. Neuborne, Political and Civil Rights in the United States 1008-23 (1976), with the result that its borders are not well defined. See Henkin, Privacy and Autonomy, 74 Colum.L.Rev. 1410, 1430 (1974). But while the contours of this protected sphere can be defined only with time and trial, the Constitution as we prize it is unthinkable without a right of privacy--a right to be let alone--and its entailments. And all our powers of privacy, whether they be our Fourth Amendment control over our property, control over the informational portrait of us available to the government and others, see, e.g., Whalen v. Roe, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), or control over the thoughts we may have, see, e.g., Sobell v. Reed, 327 F.Supp. 1294, 1305 (S.D.N.Y.1971), doubtless have their origin in experience and in law in the person's control over her own body.
 
 
 38
 This right--to the dignity of one's bodily integrity--is as old as the common law and has been mentioned as being incorporated in the right of personal security identified in the 39th Article of Magna Charta. See Davis v. Hubbard, 506 F.Supp. 915, 931 (N.D.Ohio 1980). And the doctrine of informed consent, see generally, W. Prosser, The Law of Torts Sec. 18, at 104-05 (4th ed. 1971), is an entire field of tort law that is related to the right to bodily integrity in the doctor's office.[2]
 
 
 39
 Although compulsory vaccinations, Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905), compelled blood tests, Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and rectal cavity searches, Rivas v. United States, 368 F.2d 703 (9th Cir.1966), cert. denied, 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967), have from time to time been upheld where there is clear necessity, procedural regularity, and little or no physical risk, see L. Tribe, American Constitutional Law 914-15 (1978), "in each case ... [the] government's burden was to provide more than minimal justification for its action." Id. at 915.
 
 
 40
 Yet, even in prison, the social context where the government's prerogatives are most routinely upheld and the individual's liberties and decencies most routinely neglected, we have assumed that inmates have a right not to be viewed unclothed by guards of the opposite sex. See Forts v. Ward, 471 F.Supp. 1095 (S.D.N.Y.1978), rev'd on other grounds, 621 F.2d 1210, 1214 & n. 6 (2d Cir.1980) (female inmates). Hudson v. Goodlander, 494 F.Supp. 890, 893 (D.Md.1980) (male inmates). A fortiori, complainants at a police station have been held to enjoy bodily privacy rights. York v. Story, 324 F.2d 450, 455 (9th Cir.1963), cert. denied, 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964). Here, the State's reasons for disregarding Gargiul's rights are far less persuasive than in these other contexts, and I fail to see how a right shared by prisoners and arrestees cannot be enjoyed by a schoolteacher. It is true that the Supreme Court has never held whether a person has a constitutionally protected right to decline a physical examination by a member of the opposite sex. But the Court has spoken broadly of the "protected intimate relationship" which "extends to the doctor's office." See Paris Adult Theatre I v. Slaton, 413 U.S. 49, 66 n. 13, 93 S.Ct. 2628, 2640 n. 13, 37 L.Ed.2d 446 (1973). Moreover, there would be naked irony in the Court's protection of those who disrobe publicly to express themselves, see Schad v. Borough of Mount Ephraim, 452 U.S. 61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981), alongside a refusal to protect those who express a desire to keep their clothes on. Even the Second Circuit's decision in East Hartford Education Association v. Board of Education, 562 F.2d 838, 856 (2d Cir.1977) (en banc), permitting a school board to force teachers to adhere to a dress code, said nothing of a power to compel teachers to submit to examinations by physicians of the opposite sex.
 
 
 41
 Here the State's interests in a teacher's physical well-being primarily involve safeguarding the health and welfare of students, which can readily be served by an examination by a physician of the teacher's own sex. Uniform or consistent application of standards might be a reason for having examination of all teachers by one physician but surely the standards of the medical profession are sufficiently uniform that this interest does not outweigh the individual teacher's above-minimal interest in bodily integrity. And, interestingly, the alternative solutions suggested by appellant Gargiul would, had the Board been flexible, have satisfied the statute under its terms.
 
 
 42
 All of this is not, of course, to say that a teacher has a right to examination by a physician of choice--only an option to examination by a physician who is of the same sex as the teacher and who is otherwise competent and apt, where bodily integrity is threatened by the very act of examination. If this gives too much recognition to individual sensibilities or sensitivities, I would err on that side rather than on the side of an all powerful state. See Oakes, The Proper Role of the Federal Courts in Enforcing the Bill of Rights, 54 N.Y.U.L.Rev. 911, 922, 931-32 (1979).
 
 
 
 *
 Honorable Charles H. Tenney, Senior District Judge of the Southern District of New York, sitting by designation
 
 
 [1]
 Gargiul had requested assignment to a first grade teaching position for the 1974-75 school year. However, because there were no openings for first grade teachers at Liverpool Elementary School, where she wanted to teach, she continued as a kindergarten teacher
 
 
 [2]
 N.Y.Educ.Law Sec. 913 (McKinney 1982-83 Supp.), in effect at the time of Gargiul's suspension, provides in pertinent part that:
 In order to safeguard the health of children attending the public schools, the board of education or trustees of any school district ... shall be empowered to require any person employed by the board of education or trustees ... to submit to a medical examination by a physician of his choice or school medical inspector for the board of education or trustees ... in order to determine the physical or mental capacity of such person to perform his duties.
 
 
 [3]
 28 U.S.C. Sec. 1738 provides:
 The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto.
 The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.
 Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.
 
 
 [4]
 The Board's refusal to permit Gargiul to be examined by a female doctor rather than by its own male physician is even more unreasonable in light of the fact that the Board employs far more female than male teachers. Statistics submitted by counsel for the appellees indicate that in January 1975, 414 of the 636 teachers employed by the Board were women
 
 
 [5]
 We note, however, that Gargiul may not be entitled to recover for the entire period of her suspension. In Kurzius v. Board of Education, 81 A.D.2d 827, 438 N.Y.S.2d 824, appeal discontinued, 54 N.Y.2d 1027 (1981), the Appellate Division held that a teacher whose return to classroom duties was delayed by her own failure to have a previously requested report from her personal physician promptly transmitted to the school district physician was not entitled to back pay. Kurzius suggests that Gargiul is not entitled to be paid for any period during which her own failure to have her medical records sent promptly to Dr. Day delayed his decision concerning her fitness to return to work, and the necessity for a personal examination
 
 
 [1]
 See Craven, Personhood: The Right to be Let Alone, 76 Duke L.J. 699 (1976). There are, of course, those who argue that privacy and personhood are merely a species of substantive due process. See Monaghan, Our Perfect Constitution, 56 N.Y.U.L.Rev. 353, 354 (1981)
 
 
 [2]
 One supposes that bodily integrity in a medical sense is involved at the root of the underlying rationale of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). See also Hawaii Psychiatric Society v. Ariyoshi, 481 F.Supp. 1028, 1043-45 (D.Hawaii 1979)