**Steven SCHWARTZ, Plaintiff,**

v.

**Lee BROWN, as Police Commissioner of the City of New York, Rae Downes Koshetz, as Deputy Commissioner–Trials of the New York City Police Department, The Police Department of the City of New York and The City of New York, Defendants.**

No. 92 Civ. 1254 (RWS).

United States District Court, S.D. New York.

June 30, 1994.

Joseph Fallek, P.C. (Andrew M. Fallek, of counsel), Brooklyn, NY, for plaintiff.

Paul A. Crotty Corp. Counsel of City of N.Y. (Geoffrey Mort, Asst. Corp. Counsel, Ruby Bradley, of counsel), New York City, for defendants.

### OPINION

SWEET, District Judge.

Defendants former Police Commissioner Lee Brown ("Brown"), Rae Downes Koshetz ("Commissioner Koshetz"), the New York City Police Department ("NYPD") and the City of New York (the "City") (collectively, the "Defendants") have moved for an order of summary judgment, pursuant to Rule 56, Fed.R.Civ.P., against the Plaintiff Steven Schwartz ("Schwartz"). In turn, Schwartz has cross-moved for an order of summary judgment.

The motions were argued before this Court on April 27, 1994, and were deemed fully submitted at that time. For the rea-

sons set forth below, Defendants' motion for summary judgment is granted.

### The Parties

Schwartz was a Police Officer in the NYPD until his discharge on October 23, 1991.

Brown was the Police Commissioner of the City. Commissioner Koshetz is the Deputy Commissioner of Trials in the NYPD and is responsible for disciplinary hearings involving departmental employees. Commissioner Koshetz was the hearing officer in Schwartz's disciplinary trial.

NYPD is an agency of the City. The City is a municipal corporation organized and existing under the laws of the State of New York.

### Facts and Prior Proceedings

Schwartz was appointed a New York City police officer on January 21, 1985. He was at first assigned to the 77th Precinct in Brooklyn from December 10, 1986 to December 17, 1987, whereupon he was assigned to the 84th Precinct, also in Brooklyn, for the remainder of his service. On October 23, 1991, Police Commissioner Brown directed that Schwartz be terminated as a police officer as a result of his reckless driving history.

During Schwartz's tenure as a police officer he received numerous command disciplines concerning his driving. On January 30, 1987, Schwartz received his first command discipline for driving his radio motor patrol car with lights and sirens on for in order to evade traffic congestion—and not in response to an official police assignment—in violation of department regulations. Several months later, on March 20, 1987, Schwartz received another command discipline for running a "steady" red light and driving in the oncoming lane of traffic while driving a radio motor patrol car with its lights and sirens activated. Again, Schwartz was not responding to any police assignment.

On August 2, 1987, Schwartz struck and killed a pedestrian, who was in a cross walk, when he ran a "steady" red light at a speed of more than 45 miles per hour in a radio motor patrol car while en route to a police "radio run" call. The Department Inspector who reviewed the incident concluded that

Schwartz was traveling at an excessive rate of speed, had not exercised due caution, and recommended disciplinary charges. None were brought at that time.

On September 20, 1988, Schwartz was issued a summons in Virginia for reckless driving after he was stopped by the Kent County Police for weaving in and out of traffic at a speed over 100 miles per hour. Schwartz requested "professional courtesy" from the Virginian officers who nonetheless issued him a summons. Schwartz was convicted and fined $500 for reckless driving and passing on the right shoulder.

Nine days later, Schwartz struck and killed another pedestrian while driving to work his Pontiac automobile, bearing the vanity license plate "MY T QUICK." Witnesses stated that Schwartz was traveling at a high rate of speed in the safety lane for at least six blocks. They further alleged that after he struck the pedestrian, Schwartz got out of the car, showed his badge to bystanders and told them "you didn't see anything."

The next month, in October of 1988, one of Schwartz's neighbors filed a complaint with the Patrol Borough Staten Island ("PBSI") about Schwartz's dangerous driving in his housing complex. In response to this complaint, the Field Affairs Unit ("FIAU") of the PBSI instigated an investigation of Schwartz's driving habits. In the FIAU investigation, undercover officers followed Schwartz to and from work during January and February of 1989. The officers observed Schwartz commit six moving violations on January 5, 1989, four moving violations (including running three red lights) on February 16, 1989, and three moving violations (including running two red lights) on February 23, 1989.

On March 29, 1989, Lieutenant Economou of the Internal Affairs Division interviewed Schwartz and advised him of the FIAU investigation which issued Schwartz 13 summonses for the moving violations observed by the undercover officers. At the end of that interview, Schwartz became so distraught and emotional that his firearm had to be removed, and he was taken to the NYPD's psychological services office for an exam. Thereafter, Schwartz was placed on restricted duty.

On April 14, 1989, formal departmental charges and specifications were brought against Schwartz regarding his driving history. Schwartz pleaded guilty and agreed to a negotiated settlement—consisting of the deferred forfeiture of ten vacation days—prior to the hearing.

On September 10, 1990, Police Officer Thomas Farina ("Farina") stopped Schwartz on the Staten Island Expressway for speeding in excess of 100 miles per hour. Two days later, on September 12, 1990, Police Officer Sean Flood ("Flood") stopped Schwartz for driving at 124 miles per hour. Based upon these incidents, departmental charges were again lodged against Schwartz.

Although the possibility of a negotiated settlement with Schwartz was discussed with NYPD, First Deputy Commissioner Raymond Kelly, based upon the recommendations of Deputy Inspector Jeremiah Quinlan and other high ranking officials, determined that the charges against Schwartz should be adjudicated at a departmental hearing.

### The Hearing

The hearing was held before Commissioner Koshetz on September 10 and 12, 1990. Schwartz was represented by counsel and testified in his own behalf. Officers Farina and Flood both testified at the hearing. Officer Farina testified that was unable to either identify Schwartz as the "Schwartz" he had pulled over on the night of September 10, 1990, nor was he able to recall how fast the "Schwartz" he had pulled over had been driving.[1] Officer Flood, by contrast, positively identified Schwartz and stated that he had clocked Schwartz with his radar gun at 124 miles per hour. (Decision at 3; Hearing Trans. at 20–24.)

In her decision, Commissioner Koshetz found herself "constrained" to find Schwartz not guilty of the first Specification concerning incident of September 10, 1990. (Decision at 5.) She further noted that although "the witness' [Farina's] inability to recall the salient facts [is] extremely suspicious, espe-

---

1. Farina did recall reading the name Schwartz off a police identity card. (Hearing Trans. at 6.)

cially in light of the fact that he was initially questioned about the incident only four days later, the evidence is simply insufficient to merit a finding of Guilty absent a confession by the Respondent." (Decision at 6.)

Commissioner Koshetz then proceeded to find Schwartz guilty as charged of the second Specification concerning his driving on the night of September 12, 1990. In forming Schwartz's penalty, Commissioner Koshetz reviewed his entire service record, including a memorandum in his personnel folder from Deputy Inspector Philip W. Lee (the "Lee Memorandum") of the Employee Management Division. The Lee Memorandum was dated June 5, 1991, and assigned Schwartz to the division's Special Monitoring Program because of "a pattern of extremely reckless driving." The Lee Memorandum cited Schwartz's two fatal accidents and a series of traffic infractions since 1987. (Decision at 8–9.)

After reviewing Schwartz's entire record, including the Lee Memorandum, Commissioner Koshetz concluded:

> Although there is no proof that [Schwartz] was at fault in the fatalities mentioned in Lee's report, it is significant that the involvement in these tragedies did not make him a more cautious and conservative driver. To the contrary, even accepting his estimate of his speed on September 12, 1990, traveling 90 miles an hour on a public road demonstrates a conscious decision to drive recklessly. In sum, if two fatal accidents, regardless of who was at fault, and a string of summonses are not enough to change a person's behavior, I know of no disciplinary penalty short of termination that is likely to achieve that result. Therefore, because [Schwartz] has demonstrated that he lacks the judgment and the discipline to serve in this position of trust and responsibility, I recommend that he be DISMISSED from the New York City Police Department.

(Decision at 9.)

On September 30, 1991, Schwartz submitted his written objections regarding the Deci-

sion to Commissioner Brown, pursuant to *Fogel v. Bd. of Educ.*, 48 A.D.2d 925, 369 N.Y.S.2d 517 (2d Dept.1975). Police Commissioner Brown accepted Commissioner Koshetz's recommendation and, in an order dated October 23, 1991, directed that Schwartz be terminated as a police officer.

Schwartz filed this Complaint on February 21, 1992 alleging the following two causes of action: (1) the Defendants impermissibly considered "allegations and innuendo" as set forth in the Lee Memorandum, in violation of Schwartz's rights to due process under the Fourteenth Amendment and his civil rights under § 1983 (Compl. ¶¶ 31–34); and (2) the Defendants' discharge of Schwartz was "arbitrary and capricious, an abuse of discretion," constituting a denial of equal protection under the laws of New York and the Constitution.

### Discussion

Every society gets the kind of criminal it deserves. What is equally true is that every community gets the kind of law enforcement it insists on.[2]

### I. The Standard For Summary Judgment

The Rule 56 motion for summary judgment is "an integral part" of the Federal Rules of Civil Procedure and facilitates the overall purpose of the Rules as stated in Rule 1, namely, "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Silver v. City Univ. of New York*, 947 F.2d 1021, 1022 (2d Cir.1991).

The Second Circuit has unambiguously defined the role of the district court in deciding Rule 56 motions:

---

**2.** Robert Kennedy, *The Pursuant of Justice*, pt. 3, "Eradicating Free Enterprise in Organized Crime" (1964).

The district court's role ... requires the court not to resolve disputed issues of fact itself, but rather to see if there are issues of fact to be resolved by the factfinder at trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986). That is to say, when examining the record before it to see if there are any genuine issues of material fact, the court's focus is on issue-finding, not on issue-resolution. In making its assessment, the trial court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *See United States v. Diebold,* 369 U.S. 654, 655 [82 S.Ct. 993, 993, 8 L.Ed.2d 176] (1962) (per curiam).

*Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993).

The Second Circuit has repeatedly noted that "[a]s a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (citing *Celotex v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2551 n. 2, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting) and *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)); *see United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992); *Burtnieks v. City of New York,* 716 F.2d 982, 983–84 (2d Cir.1983). If, when "[v]iewing the evidence produced in the light most favorable to the nonmovant ... a rational trier [of fact] could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991).

When a motion for summary judgment is made and the nonmoving party will bear the burden of proof at trial, "Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim." *Bay v. Times*

*Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991). However, if the moving party is still entitled to judgment as a matter of law after all the facts alleged by the nonmoving party are resolved in his favor as true, then any remaining factual disputes are neither "genuine" nor "material" and will not prevent the court from granting the motion. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("a material fact is 'genuine' ... if the evidence is such that a reasonably jury could return a verdict for the non-moving party."). Thus, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Finally, the court must look to the substantive law to determine which facts are "material," to wit, disputed facts that might affect the outcome of the suit under governing law. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. It follows, then, that "[e]ntry of summary judgment indicates that no reasonable jury could return a verdict for the losing party." *Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir. 1991).

## II. Schwartz's Due Process Claims Are Denied

### A. Procedural Due Process

In *Cleveland Bd. of Educ. v. Loudermill,* the Supreme Court considered the question of what pre-termination process was due to a public employee who may only be discharged for cause. "The essential requirements of due process ... are notice and an opportunity to respond...." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985) ("*Loudermill*"); *see also Brady v. Town of Colchester,* 863 F.2d 205, 211 (2d Cir.1988) (holding "plaintiff must prove that he or she was deprived of " 'an *opportunity* .. granted at a meaningful time and in a meaningful manner' for [a] hearing appropriate to the nature of the case.") (quoting *Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28

L.Ed.2d 113 (1971) (emphasis added) (citations omitted)).

The *Loudermill* Court determined that "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* The Court then admonished greater pre-termination procedural rights "would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.; see also Bishop v. Wood,* 426 U.S. 341, 349, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976) (noting a federal court "is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies").

■ Here, Schwartz's due process rights were fully accorded.[3] Schwartz was provided with notice and an opportunity to be heard: he was afforded a full evidentiary hearing, represented by counsel, cross-examined hostile witnesses, and presented evidence on his own behalf. *Cf. Vitarelli v. Seaton,* 359 U.S. 535, 545, 79 S.Ct. 968, 975, 3 L.Ed.2d 1012 (1959) (holding U.S. Department of Interior violated its own termination proceeding regulations when it denied employee the right to cross-examine adverse witnesses and failed to provide a specific statement of charges at disciplinary hearing).

■ Schwartz contends Commissioner Koshetz's consideration of the contents of the Lee Memorandum violated his due process rights pursuant to § 15–07 of the Rules of the City of New York. Section 15–07 provides in part that: "[t]he penalty imposed upon a respondent should take into account the respondent's employment history as well

as the nature of the proven misconduct." *See* The Official Compilation of the Rules of the City of New York, Vol. 12, Title 38, § 15–07 (9–30–91).

Schwartz's theory cannot prevail. First, the plain language of § 15–07 is permissive in nature and in no way circumscribes the relevant information which may be considered for the purposes of meting out a suitable penalty at a pre-termination hearing.[4] The wording of § 15–07 merely states that a Hearing Officer may, and indeed should, consider the employee's employment history, but it does not preclude the consideration of other relevant details such as the employee's personal characteristics, background or antecedent acts as grounds for discharge.

Second, the Decision indicates that Commissioner Koshetz considered Schwartz's employment history in accordance with the parameters set forth by the New York Court of Appeals in *Pell v. Bd. of Educ.,* 34 N.Y.2d 222, 356 N.Y.S.2d 833, 313 N.E.2d 321 (1974).

The Respondent was appointed to the Department on January 21, 1985. He holds two awards for Excellent Police Duty. In 1989, while he was on restricted duty and assigned as a cell attendant in the 84th Precinct, he was rated "Meets Standards," but the lieutenant who reviewed the evaluation remarked that the Respondent "disappears frequently and must be found" and that he "requires constant supervision." In 1990, when he was back on patrol, the same rater described him as "a very enthusiastic officer who tries his best to do a good job." The lieutenant who reviewed that evaluation described the Respondent's productivity as "excellent," but commented that he "re-

---

**3.** This case is superficially similar to *Drogan v. Ward,* 675 F.Supp. 832 (S.D.N.Y.1987), where a police officer's promotion was delayed for a period of several years while he was the subject of an internal investigation. However, the *Drogan* Court found the factual record to be insufficiently developed in order to grant Plaintiff's motion for a summary judgment as to the unreasonableness of the delay. Here, the factual record is thoroughly developed.

**4.** Rule 15–07 provides in full:
§ 15–07 Penalties. (a) The penalty imposed upon a respondent should take into account

the respondent's employment history as well as the nature of the proven misconduct.
(b) Penalties shall be imposed upon a respondent consistent with applicable provisions of the Civil Service Law and Administrative Code of the City of New York.
(c) An alternative penalty may be agreed upon by the parties, pursuant to subdivision (h) of § 15–04, outside the scope of applicable statutes.
The Official Compilation of the Rules of the City of New York, Vol. 12, Title 38, § 15–07 (9–30–91).

quires some guidance," "should spend less time on telephone," [sic] "needs to keep busy," and "has a lot of energy to expend." (Decision at 7.)

Commissioner Koshetz, having reviewed Schwartz's employment record, next considered the remaining contents of Schwartz's personnel folder, including the Lee Memorandum, from the Employee Management Division, which assigned Schwartz to the Special Monitoring Program because of his "pattern of extremely reckless driving." (Decision at 7.) It is reasonable to believe that a memorandum from the Employee Management Division, contained in an employee's personnel file, constitutes employment history within the meaning of Rule 15–07.

■ Schwartz next analogizes Commissioner Koshetz's reference to his personnel file to the due process protection afforded a criminal defendant under *United States v. Fatico*, 579 F.2d 707 (2d Cir.1978). Pursuant to the *Fatico* holding, the Second Circuit permits criminal defendants to review the contents of his or her presentence report and to have a hearing as to matters that he or she disputes.

However, the *Fatico* analogy does not serve Schwartz's cause. First, the enhanced due process rights afforded to criminal, as opposed to civil, litigants which stem from the very nature of the liberty interests at stake are well known and need no further elucidation here. Second, such an analogy cannot apply since the record indicates Schwartz was able—and in fact encouraged—to review his personnel file. As Commissioner Koshetz explained at the Hearing:

> I'm also obligated by law to tell you that if you should be found guilty after of [sic] a disciplinary offense I will go to Employee Management Division and look at your personnel folder and [sic] to help me in formulating a recommendation of penalty to send to the Police Commissioner. You have the right to look at your own folder

and to even make written remarks to anything that is written in that file that I might be looking at.

(Transcript at 40–41.) Schwartz apparently took Commissioner Koshetz's advice as he duly submitted his written objections to the Decision to Commissioner Brown, pursuant to *Fogel v. Bd. of Educ.*, 48 A.D.2d 925, 369 N.Y.S.2d 517 (2d Dept.1975). Finally, the New York Court of Appeals has long upheld the practice of considering public employees' "prior record in determining the punishment to be imposed." *Pell*, 34 N.Y.2d at 240, 356 N.Y.S.2d 833, 313 N.E.2d 321.[5] To disturb such long standing precedent based upon these facts would not serve the interests of justice well.

Schwartz lastly analogizes his due process claim to one considered by the Supreme Court in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) ("*Accardi*") (reversing the denial of petitioner's application for suspension of deportation under the Immigration Act of 1917). In *Accardi*, a blacklisting case, the United States Attorney General included the petitioner's name in a "confidential list of 'unsavory characters' whom he wanted deported." *Id.* at 267, 74 S.Ct. at 503. The Court criticized the "Board's alleged *failure to exercise* its own discretion, contrary to existing valid regulations," *id.* at 268, 74 S.Ct. at 503–04 (emphasis in original), in blindly following the blacklist's recommendations when it ordered Accardi's deportation.

Here, there is no factual basis in the record supporting Schwartz's *Accardi* analogy. Commissioner Koshetz's reference to the Lee Memorandum in the Decision cannot seriously be compared to a blacklist. Commissioner Koshetz, in rendering her decision, relied on a plethora of inputs including: the testimony of two witnesses (Decision at 6); Schwartz's testimony (Decision at 6); Schwartz's "service record" (Decision at 7); the evaluations of his superior officers (Decision at 7); as well as the infamous Lee Memorandum.

---

5. It is also well established under New York law that the Courts do not have the "power to upset the determination of an administrative tribunal on a question of fact ... [as] 'the courts have no right to review the facts generally as to weight of evidence, beyond seeing to it that there is "substantial evidence." ' " *Pell v. Bd. of Educ.*, 34 N.Y.2d 222, 230, 356 N.Y.S.2d 833, 313 N.E.2d 321 (1974) (citation omitted).

Procedurally, Commissioner Koshetz notified Schwartz of the items which she would consider in formulating her penalty at the Hearing. (Hearing Transcript at 40–14.) Accordingly, there is simply no basis to Schwartz's contention that the Lee Memorandum somehow predetermined Commissioner Koshetz's findings or penalty determination. *Cf. Accardi,* 347 U.S. at 267, 74 S.Ct. at 503 (finding immigration Board regulations prohibit the Board of Immigration Appeals from relying on the " 'the Attorney General's proscribed list of alien deportees.' ").

Accordingly, there is nothing in the record or in the Decision to indicate that Commissioner Koshetz did not appropriately consider the relevant facts concerning Schwartz's employment history within the plain meaning of New York City Rules § 15–07 or the parameters of the *Pell, Fatico* and *Accardi* decisions.

### B. *Substantive Due Process* [6]

■ Schwartz further contends his substantive due process rights were abridged because the magnitude of his punishment does not match the offense of which he is accused as compared to other officers accused of similar conduct.[7] Schwartz buttresses his substantive due process claim with the conjecture that this Court should somehow affirmatively oblige the NYPD to institute a disciplinary tracking mechanism so that accused Police Officers and their lawyers can compare penalties in preparing their defense and subsequent appeals of disciplinary hearings.

The Second Circuit has held that "the substantive component of the Due Process Clause does not provide a remedy to a public employee that would not be available to a private employee subject to identical conduct by his employer." *McClary v. O'Hare,* 786

F.2d 83, 89 (2d Cir.1986) (holding that government actor must intentionally abuse his or her power as a state official to harm state employee in order to sustain substantive due process violation) (Oakes, J.); *see also Costello v. Town of Fairfield,* 811 F.2d 782, 787 (2d Cir.1987) (same) (Van Graafeiland, J., concurring). As such the substantive due process protection afforded public employees in this Circuit is limited. Indeed, "most Circuits that had considered the issue ha[ve] held explicitly or had suggested that the Fourteenth Amendment protects public employees from arbitrary and capricious government action affecting their employment." *Newman v. Massachusetts,* 884 F.2d 19, 25 (1st Cir.1989), *cert. denied,* 493 U.S. 1078, 110 S.Ct. 1132, 107 L.Ed.2d 1037 (1990).

Accordingly, in order to sustain his substantive due process claim, Schwartz must allege that the Defendants' "actions . . . were so unreasonable as to be arbitrary." *Gargiul v. Tompkins,* 704 F.2d 661 (2d Cir.1983) (*"Gargiul"*), *vacated & remanded on other grounds,* 465 U.S. 1016, 104 S.Ct. 1263, 79 L.Ed.2d 670 (1984). In *Gargiul,* the Second Circuit held the Liverpool Board of Education violated a female employee's rights to substantive due process when it terminated her for refusing to submit to a male physician's physical exam, in spite of her offer "to provide certification of her medical condition, at her own expense, by any female physician selected by the Board, or recommended by a local medical society." *Id.* at 668. The *Gargiul* Court applied the rational relation test to determine the Board's actions were not rationally related to a "proper governmental purpose." *Gargiul,* 704 F.2d at 668 (citing *Koch v. Yunich,* 533 F.2d 80, 84 (2d Cir. 1976)).

Here, Schwartz has made no showing that the Defendants' decision to terminate his em-

---

6. Plaintiff's substantive due process claim is not pleaded in his Complaint. However, as the Defendants have responded to this claim and as the Plaintiff has requested that he be permitted to replead this claim in the event this Court denies review, this claim will be addressed at this time in the interests of judicial economy. (*See* Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Summ.J.; Falleck Reply Aff. ¶¶ 3–4.)

7. In support of this notion, Schwartz has attached numerous redacted copies of the Charges and Specifications and/or Disposition Sheets for the years 1988–1990. Upon review, it is evident that the attached exhibits do not include offenses which included repeated reckless driving histories augmented by civilian fatalities. In addition, Schwartz's papers neither elucidate how these documents relate to his case nor do they shed light on the nature of the penalties meted out by the NYPD. *See* Pl.'s Exs. C–S; 1–68.

ployment does not have a rational relationship to the Police Department's interest in ensuring the public safety through the employment of a disciplined cadre of officers who do not themselves regularly violate the laws, and at the cost of several human lives. Schwartz's exhibits regarding other NYPD officers' disciplinary actions do not aid his cause as he has not established that they had committed more serious offenses or had as lengthy of reckless driving histories. Applying the rational relation standard of review to these facts, there is nothing in this record that would indicate that the Defendants' irrationally terminated Schwartz's employment in violation of his rights to substantive due process.

## III. Schwartz's Equal Protection Claim Is Denied

■ The Equal Protection Clauses of the Fifth and Fourteenth Amendments of the Constitution prohibit governmental actions which interfere with the exercise of a fundamental right or operates against a suspect class such as race, alienage, or national origin. *San Antonio Sch. Dist. v. Rodriguez,* 411 U.S. 1, 16, 93 S.Ct. 1278, 1287, 36 L.Ed.2d 16 (1973). Such discriminatory action is subjected to the highest level of review, or strict scrutiny, and "will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) ("*Cleburne*"). In short, equal protection is "essentially a direction that all persons similarly situated should be treated alike." *Cleburne,* 473 U.S. at 439, 105 S.Ct. at 3254.

To establish a violation of his equal protection rights Schwartz must "charge[ ] a state officer[ ] not only with deliberately misinterpreting a statute against [him], but also with purposely singling out him alone for that misinterpretation." *Burt v. City of New York,* 156 F.2d 791, 792 (2d Cir.1946) (Hand, J.). More recently, the Second Circuit has stated that an equal protection claim based on selective application of state regulation requires showing that first, the plaintiff was selectively treated as compared to others

similarly situated, and second, the selective treatment was motivated by an intent to discriminate on such impermissible grounds as race or religion or to "inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure" the plaintiff. *FSK Drug Corp. v. Perales,* 960 F.2d 6, 10 (2d Cir.1992) (citing *Wayte v. United States,* 470 U.S. 598, 608–09, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985)).

Schwartz concedes that the "rational relation" test is the appropriate standard by which to measure his equal protection claim, (Falleck Aff. at ¶ 19), since he neither belongs to a suspect class nor has fundamental right at interest. *See Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) (per curiam) (applying rational relation test to State's mandatory retirement age for police officers).

■ The facts are plain: notwithstanding the fact that Schwartz fatally struck a pedestrian in 1987, he continued to engage in reckless and extremely dangerous driving for the next several years. In 1988, Schwartz again struck and killed a pedestrian. In 1989, a neighbor was obliged to file a complaint against Schwartz which led to a NYPD Field Affairs Investigation Unit investigation into his conduct. While under FAIU observation, Schwartz committed 13 moving violations in only three days. Finally, on February 11, 1991, Schwartz's Commanding Officer, David Scott recommended that Schwartz's be terminated primarily due to his reckless driving behavior. Concurring with Officer Scott's evaluation, Inspector Robert McCormack commented that "I am of the opinion that Police Officer Schwartz does not display the proper temperament or maturity required of a police officer." (Defs.' Rule 3(g) Statement, Ex. A.)

Applying the rational relation test to these facts it is evident that the Defendants rationally chose to terminate Schwartz's employment. No evidence has been presented that indicates Schwartz was treated more harshly than any other officer who has a driving history so reckless as to include two civilian casualties. Nor has Schwartz established

any malice or bad faith on the behalf of the Defendants.

Schwartz cannot seriously claim that the Police Department may not rationally require its officers to exhibit not only the highest levels of professional conduct, but to expect that they will not violate the very laws that they are hired to enforce.[8] The law applied to the facts in this case compels only one result. Citizens have the right to expect that they will be patrolled by a law abiding police force. The Defendants have legitimately, albeit tardily, exercised that right on behalf of New York City residents when they acted—three years and two lives later—to terminate his employment. Accordingly, the Defendants' motion for an order of summary judgment as to Schwartz's equal protection claim is granted.

### IV. *Schwartz's Pendent Claims are Dismissed*

In the absence of a valid federal claim in the Complaint at bar, this Court declines to exercise jurisdiction over the pendent state claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

### *Conclusion*

For the reasons set forth above, the Defendants' motion for an order of summary judgment is granted and the Plaintiff's is denied.

It is so ordered.

---

8. *See, e.g., Danese v. Knox,* 827 F.Supp. 185, 196 (S.D.N.Y.1993) (holding the Port Authority's "disciplinary procedures have a rational relationship to any one of a number of legitimate goals, including the maintenance of a prepared, uniformed police force ... [necessary] to completely secure and protect the Port Authority premises.").